[No. C000292. Third Dist. Mar. 25, 1987.]

MARK STEBBINS, Plaintiff and Respondent, v.
RALPH LEE WHITE, Defendant and Appellant;
CITY OF STOCKTON et al., Defendants and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to rules 976.1 of the California Rules of Court, the Reporter of Decisions is directed to publish all portions of this opinion except parts II and V.

**COUNSEL**

Rishwain, Hakeem, Ellis, LeBeouf & Ganzer, Rishwain, Ellis & LeBeouf, Albert M. Ellis and Michael R. Norton for Defendant and Appellant.

Meyer, Mitchell & Snyder and Terry Snyder for Plaintiff and Respondent.

Gerald A. Sperry, City Attorney, and Ronald J. D'Aiuto, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**SPARKS, J.**—This election contest case presents two principal issues. The first concerns the effect of a withdrawal of a peremptory challenge to the trial judge previously made under Code of Civil Procedure section 170.6. The second poses the question whether penal violations of the Elections Code committed by the candidate in the casting of absentee ballots should disqualify him from office or only invalidate the tainted ballots. On the first question we hold that a party who withdraws his peremptory challenge waives the right to object to the challenged judge on appeal. We next hold

that bribery or any other offense against the elective franchise committed by a candidate invalidates his election.

After a lengthy trial of an election contest, judgment was entered directing that defendant Ralph Lee White be removed from the office of city councilman and his certificate of election be annulled for violations of the absentee voting laws. White appeals contending: (1) The trial judge was disqualified at the commencement of the proceedings; (2) the trial judge was disqualified from hearing the second part of the proceedings; (3) he was denied due process of law by the manner in which the trial court proceeded; (4) there was insufficient evidence to support the judgment; (5) the trial court's findings were erroneous as a matter of law; and (6) where elections violations occur the proper remedy is to discount the tainted vote rather than to nullify the election. We consider and reject four of these contentions in the published portion of this opinion. In the unpublished part we consider the second disqualification claim and the due process argument. We find those two contentions to be meritless as well and consequently shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Before turning to the facts of this case, we first briefly recount the legal background surrounding absentee voting. In 1970 the California Constitution Revision Commission proposed amendments to article II of the state Constitution which, among other things, were intended to delete the constitutional provisions for absentee voting and to relegate them to the prerogative of the Legislature. (See *Peterson* v. *City of San Diego* (1983) 34 Cal.3d 225, 228-229 [193 Cal.Rptr. 533, 666 P.2d 975].) The proposals were, with some modification, adopted by the People and over the years the Legislature has extended the circumstances in which absentee voting is permissible. (*Ibid.*) Finally, in 1978, the Legislature deleted the various grounds for absentee voting and granted every registered voter the right to vote by absentee ballot without regard to the reason for such voting. (*Ibid.* See Stats. 1978, ch. 77, § 2, p. 213.) Under that legislation, the "absentee ballot shall be available to any registered voter." (Elec. Code, § 1003.) Legal controversy quickly swirled around this extension and centered on the constitutional requirement that "Voting shall be secret." (Cal. Const., art. II, § 7.) Appellate decisions soon followed.

In *Fair* v. *Hernandez* (1981) 116 Cal.App.3d 868, 878-879 [172 Cal.Rptr. 379], the trial court found in an election contest proceeding that two voters had separately cast their absentee ballots with the assistance of their respective family members, in the privacy of their own homes, and only in the presence of the assisting relative and when the voter was partially disabled. The

lower court ruled that these absentee votes were valid under those circumstances and the Court of Appeal agreed. In *Beatie* v. *Davila* (1982) 132 Cal.App.3d 424 [183 Cal.Rptr. 179], it appeared that a majority of the absentee ballots cast in a city election were picked up from the voters by a campaign committee of the winning candidates, taken to campaign headquarters, and then mailed to the election officials. On some occasions a committee member stood next to the voter while the ballot was marked, and would indicate the candidates the committee was supporting. Committee members did not mark the ballots or tell the voters how to mark the ballots. The ballots were not tampered with, but were delivered directly to the post office. The Court of Appeal held that a voter may utilize third persons, including members of a campaign committee, to mail their ballots for them. (132 Cal.App.3d at p. 429.) The court further held that a ballot is not invalid simply because the voter has voluntarily chosen to show it to someone else. (*Id.*, at p. 431.) In the absence of proof of fraud or tampering, the mere opportunity for wrongdoing, the court ruled, would not vitiate either the ballot or the election. (*Id.*, at p. 432.) In a second appeal in *Fair* v. *Hernandez* (1982) 138 Cal.App.3d 578 [188 Cal.Rptr. 45], at pages 582 and 583, the Court of Appeal recognized that a voter may allow a third party to return his absentee ballot by mail, but held where the ballot is returned "in person" (Elec. Code, § 1013), then personal delivery is required. The *Fair II* court consequently affirmed the trial court's invalidation of those ballots on the grounds that their delivery violated Elections Code section 1013.

Similar absentee ballot issues were considered by the Supreme Court in *Wilks* v. *Mouton* (1986) 42 Cal.3d 400 [229 Cal.Rptr. 1, 722 P.2d 187], a decision rendered after the trial in this case but anticipated by the trial judge. In *Wilks* it appeared that some applications for absentee ballots listed the address of a proponent of the measure at issue as the address to which the ballots were to be sent. The court held that voters may designate a place other than their residence as the place to receive their ballots. Each of the voters in fact received their ballots and there was no tampering with them and the votes were held to be valid. (42 Cal.3d at pp. 405-406.) It also appeared that in some instances a proponent of the measure at issue had assisted voters in completing their ballots. The assistance was provided at the voter's request, without fraud or coercion, all disclosures were voluntarily made by the voter, no ballot had been tampered with, and in all cases the vote reflected the decision of the voter. The high court also held that these votes were valid. "We realize," the court said, "that the integrity of an election is impaired when partisan campaign workers coerce absentee voters to give up their right to vote in secret. But the trial court determined upon the basis of substantial evidence that no such coercion occurred here." (*Id.*, at p. 410.) Finally, the court agreed with the Court of Appeal in the second *Fair* appeal that Elections Code section 1013 directs the voter to return the ballot person-

ally if he does not use the mail. However, the court held that the requirement is directory only and in the absence of fraud, tampering or coercion the votes are not to be invalidated.[1] (*Id.,* at p. 412.)

In a concurring opinion in *Wilks* Justice Grodin reiterated a concern he had expressed first in *Peterson* v. *City of San Diego, supra,* 34 Cal.3d 225, involving forms of elections which permit persons other than the voter to observe the ballot as it is cast. "The problem inherent in such systems, I suggested, 'is not simply one of purchasing votes, though a market in that commodity is far more likely if the buyer can see what he is getting. The problem includes the potential for more subtle forms of coercion. . . . [I]t is inevitable that political and special interest groups will be tempted to "assist" voters in casting their ballots, perhaps at organizational parties at which the marking and mailing of ballots constitute a group activity.' " (*Wilks* v. *Mouton, supra,* 42 Cal.3d at p. 413, quoting from *Peterson* v. *City of San Diego, supra,* conc. opn. of Grodin, J., 34 Cal.3d at p. 232.) The present appeal vividly shows that Justice Grodin's misgivings were not academic.

This dispute had its genesis in the general election held on November 8, 1983. At that time appellant White had been the 9th District Councilman of the City of Stockton since 1971. By trade, he was a bail bondsman. In the November 1983 election White was defeated in his effort to win reelection and respondent Mark Stebbins was elected instead. Stebbins began serving as councilman for the 9th District on December 12, 1983. White was unwilling to accept defeat and shortly after Stebbins took office White led a recall effort. On May 8, 1984, a special election to recall Stebbins was held. Stebbins prevailed and the recall failed. White regrouped and commenced anew his efforts to oust Stebbins and to regain his council seat. On November 13, 1984, a new petition for recall of Stebbins was filed and an election was scheduled for December 18, 1984. In addition to the question of recall, the December election was to include a special election to select the successor to Stebbins in the event recall was successful. White was one of the candidates.

---

[1]At the time of the *Wilks* decision, Elections Code section 1013 provided in relevant part: "After marking the ballot, the absent voter may return it to the official from whom it came by mail or in person, or may return it to any member of [the] precinct board at any polling place within the jurisdiction." (Stats. 1976, ch. 1275, § 18.) It also appeared in that case that a number of absentee ballots had been delivered to the ballot box in the clerk's office by persons other than the absentee voters. The high court agreed that Elections Code section 1013 "directs the voter to return the completed ballot personally if he decides not to use the mail, and that the section does not contemplate the voter's use of a third party to deliver the ballot." (*Wilks,* 42 Cal.3d at p. 411.) Nevertheless, the *Wilks* court disagreed "with the Court of Appeal in *Fair II* that the bar to third-party delivery of absentee ballots is so fundamental to the preservation of the integrity of elections that we must invalidate an absentee ballot delivered by a third party in the face of a trial court determination that there has been no fraud or tampering." (*Id.,* at pp. 411-412.)

For the December election White adopted a new strategy. He and his agents, who included James Shoals, Sammy Taylor, Connie Means, McCoswell Ward, and Donald Cotton, conducted a vigorous campaign to sign people up for absentee voting. White then maintained contact with the county clerk, Ralph Epperson, in order to ascertain when the various absentee ballots would be mailed. When the ballots were mailed White and his agents went to the homes of the various electors in order to "assist" them in casting their ballots. Although numerous witnesses testified to the type of assistance provided, a few relevant examples should suffice at this point.

Alice Faye Sharkey testified that a man came to her house and told her to get her ballot. He told her to punch a certain number, had her sign the envelope, and then took the ballot and envelope and said he would seal and mail it. Ms. Starkey was not told and did not know how she had voted. Beverly Jean Sharkey, who was also present, testified similarly, although she was aware the vote was for White. When asked if she felt like she was being forced to vote she answered: "Yes, in a way because he came to our house. He rushed us, and I don't like to be rushed."

Maria Guerra testified: "Some man, heavyset man came to my house one day and he asked me if I had voted yet. And I told him, no, I hadn't. And he asked me if I would go get it, and that he would show me how. So I got it and he told me to sign my name on two envelopes, and I did. Then he told me to punch two numbers. And I did. And so I put it in the white envelope, I put it in that one, and he took it." She did not seal the envelope. She also was not told what she had voted for, "But after he left he was going to come back to get my mother-in-law's, and when he came—after he left, I went in and I looked at my—the information that was in it, and I seen then what I voted for and who I voted for." She did not feel that her vote was voluntary, saying: "Well, he came to my house. I was planning on doing it myself. I didn't know that they come to the house to pick up the ballots. I was going to do it and mail it. But he came early in the morning and he asked me to get it so, well, I guess I was coerced. I don't know." She explained that it all happened too fast and she did not have time to think. She just did what she was told to do.

Marian Ortega testified that a man came to her house and said he worked for White. She did not invite him in but he entered anyway. She told the man that she wanted to vote for Stebbins. Moreover, she did not want to vote by absentee ballot but wanted to vote at the school. The man took her ballot and he marked it, and took it. She allowed him to do this because she wanted to get him out of her house.

Carla Johnson testified that a large man came to her house on multiple occasions to inquire whether she had voted. "Well, he was like—it was some-

body like if you—somebody asks you to do something and you say, no, but they keep bugging you and bugging you and you get tired of them bugging you, so you give up and say, 'Yeah, come on in.' " She felt intimidated and rushed. She complied with his directions to get her ballot, punch two numbers, sign the envelope and give them to him. She then discovered that she had been told to vote contrary to the manner in which she wished to vote.

Ida Roberts testified that a man came to her house and told her he worked for White. He told her to sign the ballot envelope and not to worry about punching the ballot. He did not ask her how she wanted to vote, but took the signed envelope and unpunched ballot with him. Tyrone Jacobs testified that he was not going to vote because he does not believe in voting, but people kept coming to his house and bothering him and he finally just gave his ballot to White and let him mark it himself. Rosemary Spencer testified that she does not vote, but James Shoals came to her house and took her ballot which he punched.

Cora Ledesma testified that she was new to the city when a heavyset man came to her house and registered her to vote. He returned later and asked whether she had received her ballot and when she said she had not he said it would come the following day. Her ballot came the following day and the man returned. When Ms. Ledesma's children answered the door the man entered the house. He was pushy and would not let Ms. Ledesma have time to read the election materials but just told her where to punch. She did so because she was afraid. When asked if she felt pressured the witness answered: "Well, I sort of did when he was telling me where to vote. I told him if he would give me time to read it, and he says well, no, check here and check here. I was—he made me kind of afraid of him when he was there, you know, I was alone with my children, and I says okay, fine, so I went ahead and punched what he wanted me to, then he sealed the envelope, he took it."

That some of the voters were intimidated by White's campaign staff is not surprising. Donald Cotton, identified by many of the witnesses as the person who "assisted" them in voting, is a very large, physically imposing man. And the aggressive, even violent, characters of James Shoals and McCoswell Ward stand out clearly even on a cold appellate record. The trial court took note of this in its statement of decision. Moreover, as trial progressed many of the voters called as witnesses repudiated prior sworn statements indicating their votes were solicited in the manner shown by the examples cited above. The trial court noted: "One thing was clear to the Court, however, and that was, almost to a man, the recanting electors were genuinely evincing fear in their demeanor when they contradicted or tried to explain away their

respective extrajudicial statement. This was especially true in the case of the witness, Rodney Watts."[2]

Although White's campaign strategy worked well in many instances, it did not always go so smoothly. Voter Erma Jean Turner testified that the heavyset man (Cotton) followed her mailman into her house. She testified: "Okay, well, then, I didn't vote because I was very angry because I told him that he couldn't give the mailman time to run and then me and him had some words." Cotton left and he and White returned to her house. White told her, falsely, that it was a minister that she had "cussed out." Turner explained to White that she was angry because Cotton had followed the mailman, "but I told him that I didn't care, he give my mailman time to run. Don't be following behind the mail truck, and so that's—later on then Ralph come and he told me later and I said well, I don't care. I don't run in behind my mailman and then he got my mother's ballot and mine and I voted." She voted by punching where White told her to punch, and then she gave her ballot to him unsealed. Turner's mother, Mrs. Colbert, was present and Cotton took her hand and physically punched her ballot for her. Ms. Turner testified that she did not end up voting the way she wanted to vote. When White asked her whether she felt pressured when he asked her to vote she responded: "Yeah, because you wanted to go to the poll. I shouldn't even have did it but I get tired of peoples worrying me. I'm going to stop voting. I guess I may go to jail if I stop voting but I'm—or get arrested, but I may stop voting."

Likewise, not all of the voters were afraid to express their dissatisfaction with the manner in which their votes were collected. Carol Burford testified that White came to her house, told her where to punch her ballot, and then told her it was for him. That was not the way she wanted to vote, but she did so because she was in a hurry and was not thinking. On cross-examination White established that there were no overt threats or promises made to Burford, and then asked her whether she felt he did anything wrong by asking her to vote his way. She answered: "Yes. You should have gave the person the chance to do what he wants to do."

---

[2]As trial progressed it became clear that Stebbins was challenging votes in which someone had been present or showed the voter how to vote, and where the ballot was given to White's staff with the ballot envelope unsealed. Later witnesses who had given sworn statements indicating their ballots were collected in that manner began to retract their earlier statements and to give remarkably similar answers to the question of how they voted. Typical was the answer of witness Graham: "When I received it in the mail I took it out of the envelope, and I filled it out, and I put it in the envelope. I sealed it." In some cases the retractions went too far, however. Some witnesses testified that they sealed and mailed their ballots, when it was proven that the ballots had been mailed by White's staff. And in some cases the witnesses even identified writing placed on the envelopes by White's staff as their handwriting.·

As the result of White's campaign strategy he and his staff were able to obtain in excess of 1,000 absentee ballots. These ballots were taken to White's bail bond business office, which served as campaign headquarters, and then mailed to elections officials.[3] When the vote was counted the absentee votes had determined the result. On the recall issue the votes cast at the local polling places stood 954 no to 233 yes. The absentee votes stood 886 yes to 98 no. Thus Stebbins was recalled by a margin of 67 votes. On the special election to determine Stebbins's successor White ran second in the three-person race in a fairly evenly split precinct vote. However, he received an overwhelming percentage of the absentee vote and won the election by a wide margin. Stebbins then filed this election contest.

The trial was, by stipulation, handled in two parts. The court first considered the contest of the recall election, and then addressed the special election to fill the vacancy created by the recall. The trial was lengthy and acrimonious. At the conclusion of the trial the court issued a lengthy statement of decision detailing its findings, conclusions, and reasoning. As we have previously noted, the trial court anticipated the Supreme Court's holding in *Wilks* v. *Mouton, supra,* 42 Cal.3d 400 . The lower court held that in the absence of fraud or other illegality, ballots would not be rejected because they were (1) voted in the presence of third persons, even advocates from one side who assist in selecting the chad to punch or even punching the chad, (2) voluntarily delivered to third persons, even advocates, for delivery or mailing to the election office, (3) held by the other persons for a period before being mailed, or (4) delivered unsealed to the other person for delivery. Although the trial court found a number of ballots to be invalid, they were not sufficient to change the result of the election. Consequently the court rejected the contest of the recall election. That ruling is not before us in this appeal.[4]

---

[3]Many of the ballots were returned to White or his staff in unsealed envelopes. Even when the envelope is sealed it is possible to determine how the vote was cast by holding the envelope in front of a light. The trial court noted that in allowing a candidate and his staff to collect ballots and take them to their campaign headquarters before mailing there is the potential that a dishonest staff could return only favorable ballots and discard unfavorable ones. The trial court was aware that the burden of proof in an election contest is by clear and convincing evidence, and specifically noted that its rulings would have been less favorable to White had the burden been only a preponderance of the evidence. As to whether White's staff engaged in this practice the court concluded that "[w]e may never know and there is no direct proof" that they did. For purposes of its decision the court assumed that the 266 absentee ballots which were sent out but not returned were not disposed of by White or his staff.

[4]Stebbins, the contestant, has not appealed and appears here only as a respondent. The Stockton City Attorney's office, representing the city and Frances Hong, the city clerk, has also filed a respondent's brief in which it is asserted that White presumably seeks reversal with respect to the judgment on the recall contest. The brief then discusses at length the propriety of the judgment in the recall contest. Since White was the prime moving force in the recall proceedings, it is inconceivable that he seeks reversal of the judgment upholding the recall. He in fact has not raised any issues with respect to the recall portion of the judgment. Thus that portion of the judgment dealing with the recall contest is simply not at issue here and we have no occasion to address the merits of that part of the judgment.

With respect to the special election to fill the vacancy, the court found that White committed a number of Elections Code violations. (All further statutory references are to the Elections Code unless otherwise noted.) As a result of those findings, the court ruled that White must be removed from office pursuant to section 20021, subdivision (c), and that his certificate of election must be annulled pursuant to section 20116. Specifically, the court found that White willfully violated section 29622 in that he offered a bribe to Rodney Watts in order to influence his vote. The court further found that White violated section 29610 in that he committed fraud in connection with the votes of Carol Burford, Emma (Erma) Jean Turner, and James Gorman. The court finally found that White violated section 29630 in that he willfully used a tactic of coercion or intimidation with regard to obtaining the votes of Carol Burford, Emma Jean Turner, and James Gorman.[5] Judgment was entered directing that White be removed from office and that his certificate of election be annulled. White appeals.

## DISCUSSION

## I

White contends that once the trial judge was peremptorily challenged pursuant to Code of Civil Procedure section 170.6, the challenge became irrevocable, and consequently the judge was thereafter permanently disqualified from presiding in the case, and all his ensuing decisions and judgments were void.[6] Stebbins counters that the peremptory disqualification motion can be and was validly withdrawn. ▮ As we shall explain, although a

---

[5]The court also found that White violated section 29645, subdivision (b) in that he willfully interfered with the secrecy of voting in the instances of the casting of the ballots of Burford, Turner, and Gorman. Nevertheless, the court did not find White unqualified for office for these violations since Stebbins had not alleged them except in his challenge to the legality of the votes in the recall contest. The court found that to remove White for those violations would deprive him of due process for lack of notice and opportunity to be heard.

[6]Code of Civil Procedure section 170.6, subdivision (1) provides among other things that no judge shall try any civil action when it has been established in the manner provided that the judge is prejudiced against any party or attorney in the action. Subdivision (2) of that section provides in relevant part that "[a]ny party to or any attorney appearing in any such action or proceeding may establish such prejudice by an oral or written motion without notice supported by affidavit or declaration under penalty of perjury or an oral statement under oath that the judge . . . before whom such action or proceeding is pending or to whom it is assigned is prejudiced against any such party or attorney or the interest of such party or attorney so that such party or attorney cannot or believes that he cannot have a fair and impartial trial or hearing before such judge . . . ."

White has not brought the entire record up on appeal. The clerk's transcript contains the stipulation to handle the matter in two parts, entered into on February 26, 1985, and nothing else before the amended pretrial statement of the contestant filed in May 1985, after the first part of the trial was completed. The disqualification filed by White before the trial commenced is not in the record.

peremptory challenge cannot be legally withdrawn, the actions of a disqualified judge are not void for lack of jurisdiction of the subject matter. Consequently, the error of having a disqualified judge preside at the trial can be, and in this case was, waived.

The challenge and its withdrawal occurred shortly before the trial was scheduled to start. On February 26, 1985, the parties entered into a court-approved stipulation that the issues would be bifurcated and the trial on the contest to the recall proceedings would commence on March 5, 1985. The day before the start of the trial the assigned judge disqualified himself. The case was then reassigned to Judge Frank A. Grande. The parties appeared before Judge Grande on March 8 for preliminary matters concerning the trial. White filed a peremptory challenge against Judge Grande that very morning. Judge Grande noted that White had filed a peremptory challenge but was unsure whether the motion was timely. ▮▮▮▮▮ He advised the parties that under these circumstances it was his statutory obligation to refer the question of the timeliness of the challenge to the master trial department for a determination.[7] The parties nonetheless began discussing various aspects of the case and the court repeatedly emphasized that the matter would be referred to another judge for resolution of the disqualification motion before any decisions could be made. One of the matters discussed was a continuance of the trial. In the course of that discussion White told Judge Grande that he "wanted the Court to understand the purpose of the 170 was not against Your Honor, but it was . . . . in order for me to come in to get this aired out a little bit further . . . ." Eventually White said: "Even if the motion is not—Your Honor, I would say that, you know, if the time —that if you could advise the Judge that I was just not aware that Your Honor was aware to the whole procedure of what's happening, I have no objection if he wants to disregard this 170.6. That's all I wanted to get in and get my day in court." The court inquired: "Did you file it to get a continuance? I have no problem with a continuance. If you want to withdraw it, you can do it." White responded: "I withdraw it." No one objected to this withdrawal and the case was thereupon continued. Judge Grande later presided at the rescheduled trial.

▮▮ White now repudiates his withdrawal and asserts that his peremptory challenge was irrevocable and that Judge Grande's decisions and judgment were therefore void. We disagree. As Witkin observed, "[l]ittle is accomplished by calling the judgment of a disqualified judge 'void.' The real question—the effect of the judgment—is evaded by the loose application of

---

[7]The trial court misapprehended its authority to rule upon the timeliness of the challenge. As we noted in *Brown* v. *Swickard* (1985) 163 Cal. App.3d 820 [209 Cal.Rptr. 844], "[i]t is settled that the challenged judge may rule on the timeliness of a peremptory challenge." (*Id.*, at p. 830, fn. 13; citations omitted.)

this word of many meanings. The problem is one of jurisdiction and, despite the fact that a disqualified judge totally lacks power to hear and determine the cause, the defect should not be considered a lack of jurisdiction of the subject matter, . . ." (2 Witkin, Cal. Procedure (3d ed. 1985) Courts, § 75, p. 90; citation omitted.) One of the several reasons advanced by Witkin for that conclusion is that "disqualification may be *waived* while jurisdiction of the subject matter cannot be conferred by waiver or estoppel." (*Ibid.*, citations omitted and italics in original.) We made that very point in *In re Christian J.* (1984) 155 Cal.App.3d 276 [202 Cal.Rptr. 54]. In that juvenile case the district attorney filed a motion to disqualify the trial judge under Code of Civil Procedure section 170.6. The minor, however, expressed satisfaction with the judge and consequently did not move to disqualify him. The judge then erroneously ruled that the district attorney's disqualification motion was untimely and denied it. The hearing was thereafter conducted before the challenged judge and after an adverse judgment the minor sought to overturn the judgment on the ground that the judge was disqualified by the district attorney's motion. We rejected the minor's contention. The right to urge disqualification under section 170.6 does not, we held, implicate the court's fundamental jurisdiction and hence is a matter which may be waived. (155 Cal.App.3d at pp. 280-281.) "Although the cases frequently refer to the subsequent orders or judgment of a disqualified judge as absolutely void for lack of jurisdiction and thus open to attack at any time prior to final judgment, it is clear that the right to urge the disqualification of a judge for most causes under section 170 and peremptorily under section 170.6 may be waived by the parties. Consequently, the actions of a disqualified judge are not void in any fundamental sense but at most voidable if properly raised by an interested party." (*Id.,* at p. 280; citations omitted.) In order to preserve the issue for appeal, we further held, the minor did not have to himself move to disqualify the judge. "A simple, timely objection on the record would have sufficed. Failing that, the minor waived [the judge's] disqualification." (*Id.,* at pp. 280-281; citation omitted.) That rationale applies here as well. White cannot be permitted to withdraw his motion to disqualify Judge Grande on his own volition and instigation, and to expressly consent to proceeding before Judge Grande, and yet secretly preserve his objection for appeal in the event of an adverse judgment. ■ As the maxim of jurisprudence pithily puts it, "[h]e who consents to an act is not wronged by it." (Civ. Code, § 3515.) We conclude that this maxim reflects a principle of appellate review as well. By expressly consenting to an erroneous procedure an appellant acquiesces in it and thereby loses the right to attack the error on appeal. (9 Witkin, *supra,* Appeal, §§ 305-306, pp. 316-317, and cases cited there.) ■ In short, White waived his right to complain of proceeding before Judge Grande.

There are two recent Court of Appeal decisions which superficially appear to support White's position. Both cases, however, are distinguishable on their

facts. In *Brown* v. *Superior Court* (1981) 124 Cal.App.3d 1059 [177 Cal.Rptr. 756], the defendant in a civil action filed a peremptory challenge against the trial judge. Although the disqualification was accepted, a later hearing was assigned to the disqualified judge's department. When the matter came on for hearing the plaintiff reminded the judge that he was disqualified and objected to proceeding. The judge nonetheless proceeded to hear the matter when the defendant stated he wished to proceed. The plaintiff then brought a proceeding to obtain a writ of mandate. The Court of Appeal issued the writ requiring the lower court to recognize the disqualification of the trial judge. The basis for that holding is that all of the litigants are entitled to rely upon the disqualification filed by any of them. (124 Cal.App.3d at p. 1062.) Our holding here does not dispute the rule that an objecting party is entitled to enforce the disqualification made by a different party. But as we noted in *Christian J.*, failing a simple, timely objection a litigant waives the disqualification. (155 Cal.App.3d at pp. 280-281.) The point is that litigants cannot expressly or impliedly consent to proceeding before a particular judge and still preserve an objection for appeal.

In the other case, *Louisiana-Pacific Corp.* v. *Philo Lumber Co.* (1985) 163 Cal.App.3d 1212 [210 Cal.Rptr. 368], there were three defendants, including an individual who was president and agent of the two corporate defendants. The individual defendant filed a peremptory challenge under Code of Civil Procedure section 170.6 against a particular judge. The action was later dismissed as to the individual defendant. When the matter was assigned to the disqualified judge the attorney for all the remaining defendants objected, insisting that the disqualification applied to all of the defendants. The judge nevertheless proceeded with the case. The Court of Appeal reversed the subsequent judgment, reasoning that the disqualification inured to the benefit of all parties and was not vitiated by dismissal of the individual defendant. (163 Cal.App.3d at pp. 1219-1221.) In doing so, however, the court specifically distinguished that situation from the one we are considering. "One can imagine a situation," the court hypothesized, "in which the sole defendant (or plaintiff) in a case seeks to withdraw a challenge he had made on the basis that the challenge was motivated by a mistaken belief in the bias of the challenged judge. One might speculate that he should be permitted to do so."[8] (*Id.*, at p. 1219.) That is the situation we are considering now.

---

[8]In other parts of its opinion, the court stated that the challenge "takes effect instantaneously and irrevocably" and that "once exercised, a peremptory challenge cannot be rescinded." (*Louisana-Pacific Corp., supra,* 163 Cal. App.3d at pp. 1219, 1221.) The language of the statute itself supports the assertion that a peremptory challenge, once made, cannot be revoked in the sense of reinvesting the challenger with the right to exercise a second challenge. "*Under no circumstances* shall a party or attorney be permitted to make more than one such motion in any one action or special proceeding pursuant to this section." (Code Civ. Proc., § 170.6, subd. (3); italics added.) But the disqualification is retractable in the sense that the challenger and other parties can waive the error of having a disqualified judge presiding at the trial.

██ ██ ██ White withdrew his challenge and consequently his right to object to Judge Grande on appeal was waived by his retraction of the peremptory challenge.[9]

## II*

. . . . . . . . . . . . . . . . . . .

## III

We now turn to the election contest. White contends that the evidence is not sufficient to support the trial court's findings. ██ "We are, of course, bound by the trial court's determination of the facts except to the extent that they are not supported by substantial evidence. [Citations.]" (*Wilks* v. *Mouton, supra,* 42 Cal.3d at p. 404.)[11]

White first argues that the evidence is not sufficient to support the finding that he offered a bribe to Rodney Watts.[12] Before trial Watts was interviewed

---

[9]Recently, in *People* v. *Nathan* (1987)† (Cal.App.), this court held that the erroneous rejection of a peremptory challenge under Code of Civil Procedure section 170.6 in a criminal case does not require reversal of a judgment of conviction in the absence of a showing of actual prejudice. We reasoned that a disqualification under that section does not implicate the jurisdiction of the court in any fundamental sense, and only renders the court's actions at most voidable if properly raised by an interested party. (*People* v. *Nathan*† (Cal.App.).) A litigant has an expeditious pretrial remedy by prerogative writ to remove a disqualified judge. (Code Civ. Proc., § 170.3, subd. (d).) Accordingly, it would constitute an intolerable windfall to permit a litigant to speculate on the outcome of the proceedings and reap the benefit of an automatic reversal in the event of an unfavorable judgment. (*People* v. *Nathan*† (Cal.App.).) Such a result would contravene our state constitutional provision which precludes the setting aside of a judgment in the absence of a miscarriage of justice. (Cal. Const., art. VI, § 13.) Consequently, a judgment will be set aside on appeal on the ground of an erroneous rejection of a peremptory challenge of the trial judge only where there is a showing of actual prejudice. In this case, White has failed to make any showing of actual prejudice, and even if we concluded that he had not waived his objection to the trial judge we would still conclude that the judgment should be affirmed.

[11]It is not definitively established whether the trial court is required to apply a clear and convincing proof standard or may determine election contests based upon penal provisions of the code by a preponderance of the evidence. In *Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 130 , footnote 5 [89 Cal.Rptr. 601, 474 P.2d 417], the court left that question open. In *Pierce* v. *Harrold* (1982) 138 Cal.App.3d 415, at pages 427 and 428 [188 Cal.Rptr. 458], the court held that the applicable standard is a preponderance of the evidence. In *Wilks* v. *Mouton, supra,* the Court did not specifically address this issue but did cite the general rule that the contestant has the burden of proof by clear and convincing evidence in an election contest. (42 Cal.3d at p. 404.) In this case the trial court in fact applied the clear and convincing proof standard. The standard for appellate review is the substantial evidence test. (*Ibid.*)

[12]The bribery statute, section 29622, provides: "A person shall not, directly or through any other person pay, lend, or contribute, or offer or promise to pay, lend, or contribute, any money or other valuable consideration to or for any voter or to or for any other person to: [¶] (a)

---

*See footnote *ante,* page 769.

†Reporter's Note: Opinion deleted upon direction of Supreme Court by order dated May 28, 1987(C000007).

by investigators for Stebbins. He stated that he was assisted in voting by White. He told White that he did not live in the district, but was told to vote anyway. He also stated that White had promised to help get his brother, Myron Watts, out of jail and/or prison if Rodney would vote for him. Watts signed a statement under penalty of perjury affirming what he had told the investigators. At trial, however, when Watts was asked if he made that statement he said: "It wasn't a statement. I mean I wasn't pressured, but, you know, I came under the—I wanted Ralph—I wanted Ralph to be sort of like a character witness in that case but at that time he was sentenced already and [it] wouldn't have did any good."

White first contends that since Myron Watts had been sentenced to prison he could not have gotten him out of jail and thus White cannot be guilty of offering a bribe because the voter could not have believed that the promise was performable. We reject the contention. The essence of an election bribe is the "offer or promise to pay, lend, or contribute, any money or other valuable consideration" in order to induce or reward the voter from voting or refraining from voting a particular way. (§ 29622.) A promise by a candidate to perform a valuable service which does not involve the proper administration of the office sought, which is made for the express purpose of inducing a voter to vote for him and which directly benefits the voter, constitutes a "promise to pay, lend, or contribute . . . [a] valuable consideration" within the meaning of the statute. (*Bush* v. *Head* (1908) 154 Cal. 277 [97 P. 512].) In *Bush* a candidate for the office of superior court judge promised the delegates of a political convention that if elected he would refuse to qualify and the office would thereby become vacant. This promise, the court recounted, was made "to the end and for the purpose of defeating and preventing the operation of the act of legislature increasing the number of judges in [the] county, and that there would be saved to the delegates to said convention, and to the taxpayers of the county, the expense of paying the salary of said judgeship and of the support of the said court." (*Id.,* at p. 279.) The candidate was elected and his opponent filed an election contest. The candidate's demurrer was sustained and judgment entered in his favor. The opponent appealed and the Supreme Court reversed. The Purity of Elections Act (Stats. 1893, ch. 16, § 19, p. 22.) then contained a section which was substantially identical to the present section 29622 and which made it illegal for any person to offer or promise to pay " 'any money or other valuable consideration' to induce any voter to vote in a particular

---

Induce the voter to: [¶] (1) Refrain from voting at any election. [¶] (2) Vote or refrain from voting at an election for any particular person or measure. [¶] (3) Remain away from the polls at an election. [¶] (b) Reward the voter for having: [¶] (1) Refrained from voting. [¶] (2) Voted for any particular person or measure. [¶] (3) Refrained from voting for any particular person or measure. [¶] (4) Remained away from the polls at an election. [¶] Any person violating this section is punishable by imprisonment in the state prison for 16 months or two or three years."

way." (*Id.*, at p. 282.) The high court held the contestant had stated a cause of action under this section and that the demurrer therefore had been improperly sustained. "Here the defendant [candidate] made a promise in order to induce the voters to cast their ballots for him. The promise was that he would act in a way that would result in a saving of expense to the taxpayers and electors. This was a promise of a 'valuable consideration.' It is, of course, not every promise of pecuniary benefit to the voter that is in violation of statute. A promise by a candidate to limit the cost of maintaining an office by administering it economically is no more than an undertaking to perform his duty, and is clearly not in conflict with the statute. But the promise here made went further than this. By it the candidate held out to the voters as an inducement, not the proper and efficient administration of the office, but the destruction, at least for a time, of an office created by law." (*Id.*, at p. 283.)

By the same token in this case, White's promise to the voter to endeavor to free his brother from custody in return for his vote did not relate to the proper administration of the office of city councilman. It related, at least inferentially, to White's intervention as a bail bondsman. The trial court drew that permissible inference when it recited that it "elects to believe that on the day Watts voted, White did, in fact, make a promise to help free Myron Watts if Watts would vote for White . . . ." The line between an offer of a bribe in exchange for a vote and the goodwill gestures by a candidate, as the trial court noted, sometimes becomes blurred. "Suitors for public office," the lower court observed, "often pass out matches, pencils, potholders and the like, upon which their names are not inconspicuously emblazoned or embossed. These are forms of conduct intended to create general goodwill for the candidate. So long as not overdone, they are de minimus [*sic*] and not verboten. (*Hale* v. *Farrel* [*sic*] [1981] 115 Cal. App.3d 164). [¶] If an incumbent did a service for a voter with a request for favorable consideration . . . he moves close to the line. If he demands a vote in exchange for the service, he has crossed the line." So long as the promised service does not entail the proper and lawful execution of the duties and prerogatives of his office, we agree with the trial court's assessment. There are, to be sure, First Amendment interests in full discussions in election campaigns which may prohibit undue restrictions on promises by candidates. (See *Canales* v. *City of Alviso, supra,* 3 Cal.3d at p. 132.) But for all that, a candidate cannot lawfully promise to render a valuable service for a voter in return for his vote when that service is unconnected with the proper discharge of an office-holder's duties and responsibilities. Such a promise to render a valuable service unrelated to the office sought in return for a vote crosses the line between campaign rhetoric and election bribery.

It may be that any help White could provide in attempting to free Myron from jail or prison would have been unsuccessful, although that is

speculative on this record. Nevertheless, his offer to contribute help in exchange for Rodney's vote was something of value to Rodney at the time he voted. (Cf. *People* v. *Longo* (1953) 119 Cal.App.2d 416, 420 [259 P.2d 53]; *People* v. *Megladdery* (1940) 40 Cal.App.2d 748, 783 [106 P.2d 84].) The fact that the promise may not be fulfilled is immaterial. The *Bush* court answered a similar contention this way: "It is undoubtedly true, as is pointed out by the [candidate], that the electors entertained a vain and futile hope if they believed that the office could be destroyed and left without an incumbent by means of the device sought to be employed. The failure on the part of the person elected to qualify would result in a vacancy, which could and should be filled by the governor's appointment. But this consideration does not affect the illegality of the promise made, nor its sufficiency as a basis for contesting the election." (*Bush, supra,* 154 Cal. at p. 283.)

▬ White next contends that there was no competent evidence that he offered a bribe to Rodney Watts. At trial Watts attempted to deny or explain away his pretrial statement. Under such circumstances it is established that his pretrial statement may be admitted for substantive purposes. (Evid. Code, § 1235; *People* v. *Green* (1971) 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998].) The trial court chose to believe Watts's pretrial statement because it was consistent with other evidence, and because Watts exhibited genuine fear in his trial testimony. ▬ White responds by arguing that the declarant of the alleged bribe was not Watts but himself, and the declaration should have been inadmissible as hearsay. He is mistaken. ▬ Watts's extrajudicial statement that he was offered a bribe was hearsay, but was properly admissible pursuant to Evidence Code section 1235 as a prior inconsistent statement. (See 1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 699, p. 684 et seq.; 2 Jefferson, Evidence Benchbook (2d ed. 1982) Attacking and Supporting Credibility, § 28.9, pp. 937-952) ▬ The offer of the bribe by White was not hearsay, but was the very offense which was charged. (*People* v. *Patton* (1976) 63 Cal.App.3d 211, 219 [133 Cal.Rptr. 533]; *People* v. *Collier* (1931) 111 Cal.App. 215, 240 [295 P. 898].)

Section 29610 provides: "Any person who commits fraud or attempts to commit fraud and any person who aids or abets fraud or attempts to aid or abet fraud in connection with any vote cast or to be cast, or attempted to be cast, is guilty of a felony, punishable by imprisonment for 16 months or two or three years." The court found that White violated this section with respect to voters Carol Burford, Erma Jean Turner, and James Gorman. The testimony of Burford and Turner has been set forth above. Gorman testified that White came to his home and told him to get his ballot. He had not voted before and he asked how to do so. White told him to punch two numbers and then he took the ballot. ▬ White contends that the evidence does not support the court's finding of fraud because his conduct was not deceitful.

We reject White's contention. With respect to Turner the evidence showed that White was aware that she was angry at being bothered by Cotton, so he falsely represented that Cotton was a minister in order to shame her into permitting him to assist her in voting. With respect to Gorman, White was aware that he did not know how to vote and so he told him the way to do it was to punch two numbers. That, of course, is false. The way to vote is to determine the numbers of the candidates or measures you support and to punch those numbers. Finally, White was aware that the ballots he turned in for each of those voters did not represent their votes, since they were not asked how they wished to vote but were simply told to punch certain numbers. That essentially permitted White to cast four votes in the election while the affected voters cast none. That constitutes fraud "in connection with any vote to be cast."

■ Elections Code section 29630 provides: "Every person who makes use of or threatens to make use of any force, violence, or tactic of coercion or intimidation, to induce or compel any other person to vote or refrain from voting at any election or to vote or refrain from voting for any particular person or measure at any election, or because any person voted or refrained from voting at any election or voted or refrained from voting for any particular person or measure at any election is punishable by imprisonment in the state prison for 16 months or two or three years." The court found White to have violated this section with respect to voters Burford, Turner and Gorman. Each of these voters testified that they did not desire to vote for White, but complied with his demands because of his presence. White's behavior in this matter was a far cry from the situation in *Wilks* v. *Mouton, supra,* 42 Cal.3d at page 408, where the voters had requested assistance, disclosures were voluntary, and the votes reflected the actual decision of the voter. In this case White did not ask whether the voters desired assistance and did not inquire how they wished to vote. He simply intruded upon them and told them what numbers to punch. The court's finding that White violated section 29630 was supported by the evidence.

IV

As we have recounted, the evidence supports the findings that White committed acts of bribery, fraud and coercion in the casting of some absentee ballots. ■ White contends that even if Elections Code violations are established the only remedy is to discount the affected votes and not to disqualify him from office. Once again we disagree. In *Canales* v. *City of Alviso, supra,* 3 Cal.3d at page 130, the high court held that the result of an election on a ballot measure should not be rejected for the misdeeds of its proponents unless the misdeeds affected the outcome. In a footnote the Court left undecided whether a showing that a candidate is responsible for the

misdeeds is sufficient to disqualify him absent a showing that the result was affected. "Perhaps the absence of a statutory requirement of a showing that bribery affected the result is explained by the fact that a candidate who is *convicted* of bribery is thereby rendered ineligible for office. (Cal. Const., art. XX, § 10.) We need not now decide whether a showing by a preponderance of evidence that a candidate is responsible for misdeeds specified in section 20021, subdivision (c), is sufficient to invalidate an election absent both a conviction and a demonstration that the misdeeds determined the result of the election. (Cf. *Miller* v. *Childs,* 28 Cal. App. 478, 483-484 [152 P. 972].)"[13] (*Id.,* at p. 130, fn. 5, italics in original.) It is that question we now examine.

We begin with the case cited by the high court, *Miller* v. *Childs* (1915) 28 Cal.App. 478 [152 P. 972]. That case involved the contested election of a superior court judge. The contest tendered, among other grounds, the claim the judge was ineligible "by reason of certain acts of moral turpitude in violation of the purity of election law . . . ." (28 Cal.App. at p. 479.) At the time ·of the election the solicitation of votes was prohibited by the Penal Code when it was accomplished by " 'force, threats, menaces, bribery, or any corrupt means.' " (*Id.,* at p. 482.) One of the claimed violations of that statute involved the representation by one Ed Plaisted to a convicted defendant and his wife that no jail sentence would be imposed by the judge in the defendant's pending case if they voted for the judge. The court concluded: "Of course, if [the judge] had authorized Plaisted to make such promise the former would be unfit to occupy the bench and should be removed, but the trial court found that [the judge] had no knowledge of the transaction and did not authorize said Plaisted to make such agreement." (*Id.,* at pp. 483-484.) Implicit in that conclusion is the determination that if the candidate had personally violated the elections laws he would have been subject to removal from office in an election contest proceeding.

The title in the Penal Code relating to crimes against the elective franchise has long since been repealed and incorporated into the Elections Code. The grounds for contesting an election held in a city at a general election are now found in Elections Code section 20021.[14] Under subdivision (c) of that

---

[13]The contention that the offending candidate must first be convicted of an offense against the elective franchise before he can be removed in an election contest proceeding was rejected in *Pierce* v. *Harrold, supra,* 138 Cal.App.3d 415. There the court held that the "contestants were within the proper legal framework in challenging defendant's election without the necessity of first waiting for her to be 'convicted' [of filing a false declaration of candidacy] under section 29303." (*Id.,* at p. 426.)

[14]Election Code section 20021 reads in its entirety: "Any elector of a county, city, or any political subdivision of either may contest any election held therein, for any of the following causes: [¶] (a) That the precinct board or any member thereof was guilty of malconduct. [¶] (b) That the person who has been declared elected to an office was not, at the time of the election, eligible to that office. [¶] (c) That the defendant has given to any elector or member of

section, one of the grounds for contesting an election is "[t]hat the defendant has given to any elector or member of a precinct board any bribe or reward, or has offered any bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in Division 17 (commencing with Section 29100)." In succeeding sections it is provided that an election is not to be set aside absent a showing that the result was affected in the cases of irregular or improper conduct of the election judges, malconduct of the precinct boards, or illegal voting. (Elec. Code, §§ 20022-20024.) These are the grounds for an election contest specified in subdivisions (a), (b), and (d) of section 20021. Conspicuously absent from the provisions requiring a showing that the result was affected is the situation where the candidate himself engaged in improper conduct. It thus appears that illegal conduct by a candidate is sufficient to vitiate his election.

White counters that there is no provision in the Elections Code for invalidating an election based upon contests made under section 20021, subdivision (c). The argument misses the mark. The grounds for contesting an election are set out in Elections Code section 20021 and the court is explicitly authorized to pronounce judgment in a contested election proceeding "either confirming or annulling and setting aside the election." (Elec. Code, § 20086.) Thus the question is not whether the court is authorized to annul an election on one of the statutory grounds of contest but is rather whether there is some other statutory restriction decreeing that an election cannot be annulled unless the criminally obtained votes would change the election result. Since there is no such statutory restriction, we conclude that a violation of Elections Code section 20021, subdivision (c) by the person whose election is contested constitutes grounds for annulling his election.

The result we reach today was foreshadowed in *Hale* v. *Farrell* (1981) 115 Cal. App.3d 164 [171 Cal.Rptr. 228]. There a contestant challenged the election of a city councilman on two grounds, one of which was that the challenged councilman had violated Elections Code section 20021, subdivision (c), by awarding a majority of the members of the precinct boards with what were described as "councilmanic district certificates of merit . . . ." (*Id.,* at p. 166.) The trial court sustained the councilman's demurrer to that cause

---

a precinct board any bribe or reward, or has offered any bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in Division 17 (commencing with Section 29100). [¶] (d) That illegal votes were cast. [¶] (e) That the precinct board in conducting the election or in convassing the returns, made errors sufficient to change the result of the election as to any person who has been declared elected. [¶] (f) That there was an error in the vote-counting programs or summation of ballot counts."

The term "defendant" as used in subdivision (c) means among other things the "person whose election or nomination is contested." (Elec. Code, § 20001.)

of action on the grounds that the contestant had not alleged that the results of the election had been actually affected by the award of the certificates. The Court of Appeal upheld the demurrer on the different ground that the award of the certificates did not constitute a bribe or reward for the purpose of procuring a candidate's election within the meaning of the statute. The reviewing court went on to note that the trial court rested its sustaining of this portion of defendant's demurrer on another basis. "It apparently held that in order for a contestant to state sufficiently a ground of contest under [Elections Code section 20021, subdivision (c)], the contestant must state that the proscribed act affected the result of the election. This undoubtedly is the law as regards ballot measure elections. It is questionable, though, whether such is now the law with respect to this type of misconduct in candidate elections. As our Supreme Court expressly recognized in *Canales,* there is no such statutory requirement ...." (*Id.,* at pp. 167-168, citations omitted.) Since there is no such statutory requirement, none need be shown.

V*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Evans, Acting P. J., and Sims, J., concurred.

A petition for a rehearing was denied April 20, 1987, and appellant's petition for review by the Supreme Court was denied June 17, 1987.

*See footnote *ante,* page 769.