Filed 7/15/22  P. v. Foster CA1/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES FOSTER,<br><br>    Defendant and Appellant. | A158258<br><br>(San Francisco County Super. Ct. No. SCN106955) |

After a lengthy trial, a jury determined that appellant James Foster qualifies as a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (SVPA), Welfare & Institutions Code sections 6600 et seq.[1]  The trial court sustained the San Francisco District Attorney's petition seeking his civil commitment and ordered him committed to the Department of State Hospitals (DSH).  Foster appeals that decision raising three claims of error.

First, he claims the trial court erred in excluding evidence that he was currently committed as a mentally disordered offender (MDO) and, though he could be released in 2020, he intended to return himself to the state hospital

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

until he is deemed ready to be released. Second, he contends the trial court erred in excluding the testimony of a psychologist who treated him in 2004 with a treatment called "EMDR" on the ground that the evidence was cumulative of the other expert testimony he had offered. Third, Foster argues the trial court erred in limiting his counsel's cross-examination of one of the People's expert witnesses for bias.

We reject all three arguments, and therefore also reject Foster's claim of cumulative error, and affirm.

## BACKGROUND

### I.
### *Procedural History*

In 1981, Foster violently lured a woman named Susan whom he met at a bar to his residence and raped her for two and a half hours, while strangling her into a state of unconsciousness multiple times, gouging her body with his fingers, biting her breasts, striking her face and threatening to kill her. He was 23 years old at the time. In a negotiated disposition, he pled guilty to one count of oral copulation under former Penal Code section 288a, subd. (c). Thereafter, he was committed to Atascadero State Hospital under the former Mentally Disordered Sex Offender (MDSO) Law (former Welf. & Inst. Code, §§ 6300-6330).[2] His commitment was extended every two years thereafter, sometimes with his consent and other times on the petition of the district attorney.

---

[2] Under that law, following conviction of a triggering offense, sentencing was suspended and the offender was committed to a state mental hospital for treatment. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143 & fn. 3.)

2

Foster was released in 2004 after a jury found he no longer qualified as an MDO.[3]  He soon stopped taking the medications he had been prescribed, causing an increase in auditory hallucinations.  He got angry and strangled a dog that was tied to a chain.  He began to drink heavily, which soothed him, and at one point drank so much he passed out.  He went to the home of a man named Moss, who had been on the bunk next to him, after both were released from detox.  He engaged in oral sex with Moss, his first homosexual experience, and then thought about stabbing him with knives he saw in Moss's kitchen.  He got a thrill from killing animals but had never killed a person, felt "[t]hat thrill was coming up" and "wanted to kill."  He didn't stab Moss, in part because he was afraid of getting caught and being put in prison for the rest of his life or getting a death sentence.

After leaving Moss, Foster began to stalk a woman.  A voice was telling him to rob somebody.  The girl was the prettiest one he'd ever seen, and he heard the voices telling him to rape her.  He knew how to rape; he had done it three times, and he followed her into a place of business and went to the top floor.  He followed and saw her in the hall, but she arrived at a door, used a card to go in and "got away."  The voices "started their usual trip," saying "you dumb motherfucker, you had a perfect opportunity and you—you fucked it up."

Foster was "horny" and the "medication prescribed for sex offenders to extinguish their libido was not working."  He looked up and saw the Four Seasons Hotel, entered and heard the voices saying, "see if you can get the rape right this time."  He went to the top floor to look for another victim.  Top

---

[3] The MDO statute (Pen. Code, § 2960 et seq.) imposed treatment at a state mental hospital on an inpatient or outpatient basis as a condition of parole.  (*Hubbart v. Superior Court*, *supra*, 19 Cal.4th at p. 1143 & fn. 4.)

floors tend to be more deserted making it less likely a rapist will be caught. He came upon Donna, who was trying to enter a hotel room using a cardkey.

Foster pushed Donna to the ground and covered her mouth. She was biting him and "kicking [him] in the nuts." "She put up quite a fight." The voices told him to "take her." He could have done it. He had already tied her up with telephone wire. He had "raped her in [his] mind." And "[t]here was no one around." But, seeing her fear and sadness, he "had compassion," was able to talk himself out of the rape, using "all the tools I developed at the hospital." Instead, he stole her purse and ran. As he ran down the hallway, took the wallet out of the purse, and left the purse in front of the elevator, he heard her calling security. He took the elevator down to the 14th floor and started walking down the stairs to avoid "the cops or security in the lobby," but he was too tired to walk all the way down and got back in the elevator. He attempted to leave the hotel but saw a man who had "a thing in his ear" that he knew was security and knew it was over and that he was arrested.

Foster pled guilty to burglary and robbery in 2004, and the court found true that he had a prior serious felony. He was sentenced to 15 years and 8 months in prison. He spent time in several state prisons and eventually was recommitted to a state hospital again under the MDO law.

As Foster's December 2020 parole release date approached, the district attorney filed a petition to have Foster committed to a state hospital under the SVPA. "The SVPA authorizes the indefinite involuntary civil commitment of persons found to be sexually violent predators after they conclude their prison terms." (*People v. Jackson* (2022) 75 Cal.App.5th 1, 7.) The first trial ended with a hung jury. The district attorney retried Foster, and the second jury found he was a sexually violent predator.

4

## II.
### *The (Second) SVP Trial*

#### A. The People's Case

Dr. Jeffrey Gould, a psychiatrist who practiced in San Francisco in 2004, testified from a report he prepared in 2004 after interviewing Foster.[4] Foster told Gould about the events in 2004 leading up to his arrest and conviction. Foster said that at that time he had been confined in state hospitals for 23 years and didn't know what he was getting himself into. He was prescribed Risperdal, Lithium and Prozac. Instead of going to a halfway house, he was living on the streets, in shelters and hotel rooms and working with a program for sex offenders. He stopped taking his medications but tried to act normal so the program would not know he was having problems. His auditory hallucinations became stronger than they had ever been, and he began drinking to relieve his anger.

Foster told Dr. Gould that when he was young, he killed animals when he was angry, and that when he was hospitalized, he killed a hamster. After his release, he killed a dog because he was angry, and it gave him "the thrill." He told Gould that his fourth victim, Donna, did not tell police he had tried to rape her, he was the only one who knew that was his plan, and when the voices told him he would end up back at Atascadero State Hospital he thought he'd only do 2 or 3 years, not 17.

Foster also told Dr. Gould about his childhood. His mother left him when he was six and he was placed in foster homes. He liked gory movies and killed about 100 animals because it was a thrill. He began experiencing

---

[4] Dr. Gould testified as a percipient witness rather than an expert. He had prepared thousands of such reports and had no current memory of his 2004 interview with Foster. He was permitted to read portions of his report to the jury pursuant to Evidence Code sections 1237 and 1280.

auditory hallucinations when he was 12 and was prescribed Thorazine when he was 14. He had been admitted to mental facilities repeatedly since he was a young child. He had experienced paranoid symptoms, believing government agencies were trying to get him. When he was 19, he continued to kill animals, he set fires and he was hospitalized for almost a year in Idaho. He was drinking one to two bottles of wine and one or two six-packs of beer daily when not incarcerated. He worked in a slaughterhouse from the time he was 19 until he was 21 and was fired because he liked killing too much.

Dr. Robert Owen, a clinical psychologist who conducts SVP evaluations for the Department of State Hospitals, was designated as an expert in sexually violent psychology and sexually violent predator law. He testified that he was assigned to evaluate Foster in 2018. He sought to interview Foster, but Foster declined to speak with him. Owen relied on information from other sources, including a police report about Foster's 1981 crime and the report of Dr. Gould.

Susan had been 26 at the time of the incident. She had gone to a bar and Foster was there. They talked and he told her he knew the bartenders. She knew them as well and was reassured by Foster's knowing them. He asked her to go back to his home and listen to him play the guitar, and she agreed. They went to his small cottage behind a house, and he began playing the guitar. He asked her to take her sweater off, but she declined. Then, abruptly, he ordered her to take her clothes off and began hitting her, straddled her on the bed with his knees on either side of her body, and hit her on the ears and skull multiple times, rendering her unconscious. He ripped her clothing off and ordered her to orally copulate him. When she refused, he choked her and continued hitting her. Then he began raping her. As he

6

penetrated her and began having sexual intercourse with her, he continued to hit her on the head. The offense went on for a few hours. He allowed her to use the restroom and then resumed raping her. He continued hitting her, bit her on the breasts, pushed his fingers into her neck and abdomen. Finally, after he stopped, she asked him to let her go, and he agreed but threatened to kill her if she reported the offense. She reported it anyway.

Dr. Owen opined that the fusion of sex and violence was of interest and that Foster used much more physical force and violence than he has typically seen in rapes. He also found the information in Dr. Gould's report about Foster's conduct problems as a child, including "fighting, quite a bit of stealing,"[5] and "killing animals" and deriving pleasure from it very significant. Foster's lack of long-term relationships and long term-employment (aside from the slaughterhouse) and his substance abuse problems all suggested psychiatric issues. These were further evidenced by his auditory hallucinations that started when he was young and persisted through most of his life, especially when he was not medicated; his reported paranoia; and mood changes from very down to very high. These were signs of bipolar disease and schizophrenia. Also problematic was his "ongoing aggression in criminality in adulthood."

Dr. Owen also relied on a DSH psychiatric evaluation of Foster prepared in 2018, which indicated Foster's voices had persisted until 2017 but then stopped in 2017. Owen found that significant because the persistence of hallucinations is something that accords with schizophrenia, which "typically appears in adolescence and continues throughout the lifespan." Owen attributed the fact that Foster wasn't hearing voices from

---

[5] Owen reported that Foster was first arrested when he was 15, and the arrest was for theft, auto theft, disorderly conduct and drinking in public.

7

November 2017 to November 2018 to his having been on antipsychotic medications. Other times when Foster had been taking medications, he still heard the voices.

Dr. Owen diagnosed Foster with bipolar disorder in 2018. Owen did further evaluation and prepared a report in 2019 diagnosing Foster with "schizoaffective disorder, which combines the schizophrenia and the bipolar disorder." Schizoaffective order is a very serious disease. Bipolar disease alone is a mood disorder, but "schizoaffective disorder is more of a thought disorder, problems with the way you think." They're not rational in the way you think, you're responding to the hallucinations, you're paranoid." Owen also diagnosed Foster with alcohol use disorder and antisocial personality disorder. The latter is a personality disorder that involves violating social norms, a "criminal orientation." Aggressiveness and lack of remorse are part of it. It is not a "temporary condition"; "it's part of your personality." Foster's three medical diagnoses—schizoaffective disorder (which is a psychotic condition), alcohol use disorder (which causes one to be more impulsive and aggressive and may increase psychotic symptoms) and antisocial personality disorder (which involves a man "who really doesn't care," who sees people as "things to be manipulated" and ways of "obtaining gratification")—in combination predispose Foster to commit "future crimes, sexual crimes."

Dr. Owen considered whether to diagnose Foster with paraphilia but concluded he didn't have enough information to make that diagnosis. Paraphilia is an umbrella term for a disorder of a sexual nature involving deviance, and there are different types, such as pedophilia and sexual sadism. It is not just one episode; it involves fantasies, urges or behaviors that persist for at least six months. It is an enduring kind of problem. Paraphiliac disorders are the type of disorders that predispose a person to

8

commit new sexually violent offenses. If Owen had learned that Foster admitted he went out specifically to rape a woman on each occasion, had rape fantasies in his late teens and early 20s, in 2016 was having horrible fantasies and asked to be put back on a drug that diminishes libido, or enjoyed the power over and pain he instilled in his victims while raping them, Owen would have diagnosed him with paraphilia, and specifically, sexual sadism.

Dr. Owen also opined that Foster is volitionally impaired, meaning he lacked self-control or the ability to manage his sexual urges. This was evident from his history of offending and the facts that he was not deterred from engaging in rape conduct even after having been in custody for years and that he engaged in offenses 64 days after being released from the hospital where he had been treated for 20 years. Owen's diagnosis was largely based on evidence of incidents that had occurred years ago.

Dr. Owen believed Foster still suffered from disorders predisposing him to commit criminal sexual acts and making him a threat to the health and safety of others. His bases for that opinion were that the types of disorders Foster has "don't just spontaneously disappear," Foster was symptomatic for schizoaffective disorder just a year earlier, and antisocial personality disorder and paraphilia typically persist through a person's lifespan.

Dr. Owen ranked Foster using the Static-99R, which ranks an offender based on 10 risk factors statistically shown to relate to re-offense. These are factors that can't be changed, such as the person's age, whether he has had a live-in partner for at least two years, whether he has previously been convicted of a violent act or a sex offense and whether any of his victims were strangers. Owen assigned Foster a score of five on the test, considerably higher than the average score of two and indicative of an above-average level

9

of risk. Other offenders who had been hospitalized for psychiatric problems and had a similar score had a more than 21.2 percent risk of re-offending within five years and a more than 32.1 percent risk over 10 years.

He also considered risk factors related to re-offending that are not part of the Static-99R. The Static-99R did not account for the two earlier rapes Foster admitted having committed prior to the 1981 and 2004 incidents for which he was caught. The fact that Foster re-offended so rapidly after being released from the mental hospital in 2004 was, in Dr. Owen's view, a compelling factor. Other factors that supported Owen's opinion that he needed to be in a secure facility to protect the health and safety of others included his combination of serious mental disorders and his failure to seek treatment in the community and drinking alcohol when he was released.

Dr. Hari Murthy, a staff psychologist for DSH, testified that he conducts SVP evaluations. He was designated as an expert in psychology and SVP law. Out of 166 evaluations he did for DSH, he found a person was an SVP in 24.

At DSH's request, Dr. Murthy evaluated Foster in 2017 to determine whether he met the criteria as an SVP and prepared an update report in 2019. He interviewed Foster in 2017, reviewed documents from DSH, the California Department of Corrections and Rehabilitation (CDCR), records of court proceedings, police reports and other criminal records and prepared a report. For the 2019 update, he reviewed additional materials, but did not interview Foster, who declined to speak with him.

Dr. Murthy testified about the offense committed against Susan in 1981, which we have already described, based on the preliminary hearing transcript in that case, a police report, and his interview of Foster. In the interview, Foster admitted the truth of the reported facts about the incident

10

and said he was like a "monster" that Susan had to live with, he purposely went to a lesbian bar with the plan to find a lesbian to rape, Susan's fear aroused him and when she rejected him, he "went ballistic." Foster told Murthy that, "like a spider, I lured [Susan] in."

Dr. Murthy diagnosed Foster with sexual sadism disorder, antisocial personality disorder, borderline personality disorder, unspecified bipolar disorder, alcohol use disorder, severe and other specified substance use disorder.

Sexual sadism disorder is "a disorder in which the individual has a deviant sexual interest in causing harm to others." The harm can be physical or psychological pain. The person is aroused by the suffering and has either acted on those urges with someone who did not consent or experienced distress or had difficulty functioning because of them. The interest must persist for at least six months. During his interview with Foster, Foster admitted that physically harming his victims aroused him, as did frightening them and having the feeling of power and control over them. He also admitted he first began having sexual fantasies about raping when he was 18, and these went on until he raped Susan, at which point he was 23. This is sufficient persistence to make the diagnosis of sexual sadism. From the incidents in 2004, we know Foster's urges continued even longer. Dr. Murthy opined that Foster is predisposed by this mental disorder to committing sexually violent crimes because he's aroused by hurting people and experiences a thrill.

Foster's history of torturing and killing animals also supports the diagnosis of sexual sadism disorder. His statement that he loved the animals but nonetheless killed them and could not stop himself from killing them shows a nexus between connection and harm. The research shows an

11

association of harming animals and sexual sadism. Foster's admissions that he continued to do this as an adult and did it when he was released in 2004 makes him a statistical outlier. It has been a lifelong issue for him.

Foster admitted he had rape fantasies starting when he was 18 and committed his first rape when he was about 20 or 21 and had just been released from a psychiatric hospital. He committed a second rape weeks or months after the first one. He went out looking for someone to sexually assault on both occasions. He said he violently assaulted the first victim. The second, he saw on the road after some kind of mishap. Foster said he "lured her in like a spider" and then brandished a knife and sexually assaulted her.

Dr. Murthy found evidence of activities when Foster was a child younger than 15 that supports his diagnosis of antisocial personality disorder. Foster stole at age 10, ran away from foster home placements at age 7, bullied and fought with others, stole a car as a young teenager and tortured animals. This cluster, together with fire setting, reflects someone who is severely antisocial and is typical for someone who has antisocial personality disorder.

Dr. Murthy testified that borderline personality disorder is not a mental state but something "fundamentally disordered or wrong with who the person is." It is a constellation of symptoms. The individual has significant difficulty coping with stressors and is likely to engage in impulsive behaviors in self-harmful ways, such as making suicidal gestures. Such people are prone to anger and even rageful behavior when their anger is triggered, such as in response to rejection. They have intense difficulties in interpersonal relationships.

Foster has tremendous difficulty coping with everyday stressors and required a lot of treatment for that. He would not have the high level of support he has had in the hospital and in prison if he were released to the community, where he doesn't have much support. On his own, he will struggle emotionally to cope with being outside, and in that situation people with this disorder tend to engage in behavior that is potentially harmful to others.

Bipolar disorder relates to someone who experiences mania, meaning their mood gets really, really high, and may also experience depression. Dr. Murthy does not think Foster has true bipolar disorder but has a mood disorder characterized by elevated moods. "And when he's not on his medication, his mood tends to get kind of high where he'll have more energy" and his thinking becomes "distorted" and "a little bit unwound."

Dr. Murthy opined that Foster had a severe drinking problem, based on his having consumed one to two bottles of wine and a six-pack of beer a day when he was last released and on his having had a great deal of substance abuse treatment in the hospital. If he were released, Murthy believed he would go right back to drinking and have "the same downward spiral he had last time."

Foster told Dr. Murthy he never intended to rape Donna but has given different accounts at different times. Once he told Murthy he stopped when he found out she was pregnant. But he told Dr. Gould that voices had told him to rape her. Later, he told Murthy it might be true that he intended to commit rape and "might have been the power thing." He admitted he told the victim he was going to kill her. He told Murthy he "lured her in like a spider." He also told Murthy about following the other woman he saw and

13

having urges to rape her but that she entered a hotel or something. Murthy opined that the incidents in 2004 were sexual assaults.

Dr. Murthy opined that Foster poses a "serious and well-founded risk of committing predatory sexually violent crimes, if he's released to the community." He used the Static-99R test and found Foster scored a 4, an above-average risk that indicates he is about twice as likely as the average sex offender to commit another sexual crime. This, coupled with consideration of factors not encompassed by the Static-99R that led Murthy to place Foster in the "high risk group," meant he has a 17.3 percent chance of re-offending and being caught within five years.

Dr. Murthy opined that Foster is an SVP. Important to his conclusion was that Foster had previously been found too dangerous to be in the community and was put in an institution, and that after receiving 22 years of sex offender treatment, "the best treatment that we have, to help him not sexually offend," he re-offended withing 64 days of getting out, drank, had homicidal urges to hurt a sexual partner, planned on raping one woman, said he would have if he had caught her and then "jumped on another woman."

## B. The Defense Case

Father Rene Iturbe, a Roman Catholic priest whose ministry is the jails in San Bruno and San Francisco, testified that he has known Foster since February 2018. Foster asked to see a priest because he had become a Catholic in the system, and Father Iturbe began to visit him on a weekly and sometimes twice weekly basis. He visited Foster from February until he was transferred to Coalinga State Hospital in November 2018. He prayed with Foster, went over scripture, gave him the sacraments and talked with him. Their visits ranged from 25 minutes to an hour. After Foster was returned to the jail in 2019, they resumed the relationship and began visiting again. If

14

Foster were released from custody to San Francisco, Father Iturbe would be ready to support him in any way he could.

Foster testified. He began using a walker in about 2016 and later began wearing a helmet. He has a condition called "tardive dyskinesia" that causes involuntary movement of his legs and sometimes results in falling. He has fallen many times and twice was knocked unconscious. He also wears a hearing assisting device.

While he was at Coalinga State Hospital in 2018, he participated in a discharge planning class for six or seven weeks and in other classes to prepare him for release to the community. He also participated in a Sex Offender Treatment Program and therapy sessions called EMDR with Dr. Jeannie Brown.

EMDR is a technique that uses eye movement to release or lower stress from prior trauma. He had seven or eight sessions with her, and they covered one trauma each session. After these sessions, his memories of the traumas were "not as haunting." Normally, he rocks all the time, but when he is doing the therapy with Dr. Brown he stops rocking. Examples of the traumas he put on a list Brown had him prepare included losing his mother, who abandoned him when he was a child; being in a foster home with a man who sexually abused him when he was seven years old; being put in a mummy sleeping bag and tossed in the Kern River at midnight by other boys as punishment; and being beat up really bad by a bunch of men and having his guitar busted over his head. The EMDR process has dramatically reduced his post-traumatic stress disorder.

At Coalinga, he participated in a karaoke group, practiced his guitar and was voted to be an activities coordinator for his unit. He had the job of

15

washing the windows on his unit, which he did with the walker and helmet. He had recently been making $14.50 per day doing that.

Defense counsel asked Foster about his relationships with girls during his teenage years, when he was in various institutions. Some were sexual but none involved force or violence. He had a girlfriend at Napa State Hospital in 2003 when he was in his early 40s but did not have sex with her or engage in any force or violence involving her. He had her name tattooed on his arm. He had some one-night stands with other women before that, but none involved violence.

His father abandoned his mother when he was about three, and his mother abandoned him and his brothers and sister when he was about seven. His mother dropped him and one brother off at a Baptist home and put the other two siblings at foster homes. At first, she visited but then stopped coming, and he has never seen her since.

After he raped Susan in 1981, he was committed as a mentally disordered sex offender. It was an indeterminate commitment. The commitment had to be reevaluated every year or two, but he agreed to extend the commitment five times. In 2004, after a trial, a jury found him not to be a mentally disordered offender. Before that, he had been at Napa State Hospital, which did not provide him any discharge planning classes. He was released with $80 given to him by his lawyer, 30 days of medications and no place to live.

Foster went to stay with another patient who had been released from Napa but stayed only three days because Foster saw him shoplifting and left. He didn't want to get into trouble. He went to the Center for Special Problems (CSP), which was in charge of his medications. CSP wanted to adjust or change his medications and sometimes did so without telling him.

16

One medication they gave him caused him to pass out. After the CSP changed his drug regimen, he started to have a lot of difficulties.

Foster has a friend he's known for 37 years named Bill. He has stayed in touch with him continuously. Bill has visited him in state hospitals and in prison. He had contact with Bill after he was released in 2004, and Bill helped him every way he could.

Foster's discharge plan is to be released into San Francisco with 30 days of medications, to register as a sex offender within 48 hours, to contact his father, his friend Bill and his lawyer if he needs help, to get counseling for sex offenders and to go back to AA. He wants to voluntarily wear a GPS bracelet on his ankle and do blood testing and urine testing to make sure he is not using drugs. He will stay involved with his church, try to get a temporary job cooking, apply for general assistance and food stamps and hopefully get a place in a halfway house or, if not, a shelter called Next Door. He will go to a Navigation Center that helps you get situated when you are released. If he starts having too many problems and it looks like he's going to "get in a wreck," he will 5150 himself and be locked up for 72 hours and have the hospital help him figure out what to do. In addition to applying for government benefits, he will have the $240 he earned at Coalinga Hospital.

When he was in a group, a young social worker hit him in the leg and told him he was "so cold." It "messed with [his] head," and he cried and wrote a song expressing remorse for his crimes. He sang the song, which is called "Remorse," for the jury.

Foster testified about his ailments, including high blood pressure, for which he takes medication; COPD, for which he uses inhalers; coronary artery disease, symptoms of which were a heart attack and a stroke; arthritis, which affects his legs and lower back; gout, which causes swelling

17

in his joints and pain, for which he wears a leg brace; GERD, which has to do with heartburn, gas and reflux; tardive dyskinesia, which causes difficulty swallowing, tongue movement, facial tics, involuntary shaking and involuntary bowel movements; and depression. He wears diapers because of it. Since he was transferred to Coalinga State Hospital, he has gained about 50 pounds, which limits him physically.

Between 2017 and 2018, he abused a drug called Buspar. He crushed it and snorted it, which made him feel good. He recognized that it was a problem, reported his abuse of it to jail staff and asked them to take him off it. He hasn't used it since.

Foster had a pet vole at Mule Creek prison that he caught on the prison yard. He kept it in a homemade cage and fed it clover and gave it water. After five or six months, guards told him he couldn't keep the vole because there was going to be an inspection of the prison. He took it to the yard where he had caught it and let it go.

On cross-examination, Foster admitted that he had raped three women, two in 1980 and one in 1981. He was placed in a state mental hospital for treatment until 2004. He was out for 64 days and then has been in custody ever since. In each of the rapes, he specifically went out looking for a woman to rape. He had the girlfriends he testified about while he was in state hospitals. He never had a girlfriend with whom he had sex when he was out in the community. During the period from 1978 to 1981, he had some rape fantasies.

In 2004, before he was released, he talked with jail psychiatric staff and assured them he would be fine, that he had planned really well for his release, that he had always talked to others in the past when he had bad fantasies, that the extensive therapy he had been through indicated he would

be alright, that he had "a lot of coping strategies" he had learned, and that he didn't have the fantasies anymore because he was on Depo Provera. Foster admitted that he did not know where the San Francisco AA meeting he planned to attend or the therapy or counseling he thought he could get were located or how much they would cost. He acknowledged that he needed more sexual treatment but would have to find out where he could get it. When he was released in 2004, he had 30 days of medication and services through the CSP for new medication but he went off the medication because the CSP changed the medication. Foster agreed that when he was designated an MDSO in 1981 or 1982, he had a mental disorder that predisposed him to commission of sexual offenses. He didn't know then that he was not ready to get out, but he thinks the disorder went away a couple of years ago. In 2016, when he was at Valley State Prison, he sought treatment because he had been having horrible dreams and fantasies. He requested to be put back on Depo Provera. That is the drug that takes away his sex drive. He believes he still needs sex offender treatment but doesn't believe he will ever hurt anyone again.

He knew Bill but did not go to him before 1981 and tell him he was having fantasies about raping someone. Before he was prescribed Buspar, he was buying it from other convicts and owed money to them. He ended up having to be transferred to a different prison.

On redirect, Foster testified that he took a behavior change class when he was at Atascadero State Hospital and used what he learned to stop himself from further assaulting the woman at the hotel. Other than throwing her down, he didn't touch her. He doesn't think he will ever rape again because God would not approve, Foster doesn't have a sex drive, and he

19

doesn't want to hurt anybody like he has in the past. He loves Jesus and that is good enough. He doesn't have rape fantasies anymore.

William Schappert testified that he has known Foster for about 36 years, before 1981. He gave him employment at a church, where Schappert worked doing painting or maintenance. Schappert is now retired, but when he was working, he counseled men that were coming and going and sometimes let them stay in apartments or cottages that the church had.

Schappert has been in continuous contact with Foster since he was arrested in 1981. He occasionally visited Foster in the institutions he was in. They wrote to each other continually over the years since 1981. He received six to ten letters a year from Foster and wrote him back. He also stayed in touch with Foster by telephone. He was in touch with Foster in 2004, when he was released from the state hospitals, and tried to help him. When Foster was initially released, he seemed to be doing okay. Schappert drove him to appointments, visited him, went out for coffee with him and things like that. At some point, Foster was getting frustrated. His housing situation was not going well for him. He was living in kind of a halfway house and seemed frustrated with how things were going.

Within a month or two after Foster was released, he was rearrested. Schappert continued to stay in touch with him. He has seen change in Foster's character, attitude and concern for people. Schappert challenged Foster to look at his life and, as a Christian counselor, involved the Lord in that and prayed with him. It didn't happen overnight, but Foster definitely went through a change, which Schappert observed through their conversations and the tone of his letters. If Foster is released to San Francisco, Schappert will be available to assist and support him in various ways. He would meet with Foster occasionally, take him to appointments

and generally help him get re-situated and into life. Schappert cannot help Foster with housing because the church's housing is full, but he would recommend him for a job with the church.

Dr. Alan Abrams, who is a medical doctor, a psychiatrist and a lawyer, testified that he examined Foster on one occasion and had a brief telephone conversation with him more recently. He has been employed by CDCR as a psychiatrist, senior psychiatrist, chief psychiatrist, and director of mental health services and has worked in paroles. He developed the protocol for Clozaril, which is a very toxic drug for which patients must first be tested and then monitored on a weekly basis. The protocol consisted of who was healthy enough to take it and who was not, and how it had to be monitored. Before the protocol was developed, the state prison system was not allowed to prescribe Clozaril, and afterward it could, though each prison had to prove it could follow the protocol. The court designated Abrams as an expert in medicine, psychiatry, SVP evaluations and law, the appropriate use and prescribing of drugs, including psychiatric prescriptions, and risk analysis.

Dr. Abrams interviewed Foster in October 2018. The interview covered his childhood, his history of abuse, the crime in 1981, the crime in 2004, his psychiatric treatment, his medical problems and his medications. He reviewed the transcript of the 1981 preliminary hearing, the police report concerning the 1981 offense, the transcript of a hearing concerning testimony by Dr. Murthy and a Dr. Kokubun, San Francisco jail records from 2017-2018, CDCR records, Napa State Hospital Records and the reports of Drs. Gould, Murthy, Kokubun, Owen, Sergeant and Barts.

Clozaril is an atypical antipsychotic medication, used to suppress the worst symptoms of a psychotic illness like schizophrenia. It is the best drug psychiatry has had to alleviate the suffering of psychiatric patients for the

21

past 40 years. It is used when other antipsychotic drugs have failed. Part of the protocol Dr. Abrams developed is to establish that the patient has shown no improvement with two other antipsychotics. Clozaril has side effects; it can cause heart attacks, poison the bone marrow so people become immunocompromised, cause constipation so severe that it can lead to death, cause drooling, and cause seizures. Abrams diagnosed Foster with tardive dyskinesia or TD, which results from many years of treatment with antipsychotics. Symptoms include "twisting of the lips and the tongue," twitches of the fingers, and twisting motions of the arms and legs and trunk. Clozaril reduces people's anger, liability to violence, and desire to commit suicide, stops hallucinations and delusions. It doesn't make people with mental illness like schizophrenia normal because it doesn't restore their emotional life. It affects or lessens the sex drive of some patients. If someone stops taking it, their disease will come back as it was before treatment. It would also result in their TD coming back and probably worsen it.

EMDR treatment is a variant of hypnosis where a person is asked to move their eyes back and forth tracking a ball or watch and to recount a traumatic event in their life and reprocess the emotions they felt during the event. The effect appears to be that the person develops some distance emotionally from their prior traumatic event. It has been an effective therapeutic tool for treating many people with post-traumatic stress.

Dr. Abrams opined that Foster's mental disorders as they currently exist do not create a substantial likelihood for his committing future sexually violent predatory actions, including rape. He further opined that in evaluating Foster under the Static-99R, Foster should have been assigned to the routine correctional sample, not the high risk high needs group, and the result of doing the opposite was to artificially inflate the percentage risk of

22

re-offending. He opined based on a hypothetical that involved various facts similar to those in evidence about Foster in the case that Foster does not currently have a mental disorder that predisposes him to commit sexually predatory violent behavior. The most important of the proposed assumptions to Abrams was that though the hypothetical person "might have anger issues and fantasies of rape that they were able to control their behavior in the burglary so that they did not proceed to a sexually violent act." He opined further that "because that person is able to control themselves to the degree that they can stop short of acting on a fantasy that they are not substantially likely to commit a future violent predatory act."

In Dr. Abrams's opinion, Foster "does not and he never had the symptoms or fantasies or behaviors that would have allowed an accurate diagnosis of sexual sadism to be made." Even the 1981 offense did not indicate he had sexual sadism, because a person with that disorder is "intent on inflicting pain and suffering even when the victim is compliant or unconscious. That's not what's described in the reports I read." The police report says the victim " 'stated that every time she did not try to resist or try to talk the suspect out of the sexual acts, he was nonviolent.' "

Psychologist Dr. Brian Abbott testified that he interviewed Foster on three occasions in 2018 and 2019. He diagnosed Foster with "schizoaffective disorder bipolar type, . . . multiple episodes currently in full remission."

Dr. Abbott used a tool known as the SeSaS, the validated and reliable way to diagnose sexual sadism, to assess whether a diagnosis of sexual sadism should be applied to Foster. Using the DSM-5 alone to make such a diagnosis is not valid according to recent research. It has a very high error rate (50-86 percent). The criticisms of the SeSaS Dr. Murthy cited as a reason for not using it were so minor that they did not affect its overall

23

reliability or validity.  Under the SeSaS, a score of four is required to make the sexual sadism diagnosis, and Abbott scored Foster as a one.  Based on his analysis of the SeSaS and the DSM-5, Abbott opined that Foster did not, and never had, suffered from sexual sadism disorder.

Dr. Abbott did not diagnose Foster with antisocial personality disorder.  He diagnosed Foster with schizoaffective disorder but viewed it as being in full remission.  He diagnosed Foster with alcohol use disorder in institutional remission.  These diagnoses, even in combination, did not constitute a diagnosed disorder within the meaning of the SVP law.

The Static-99R tends to overestimate the risk.  It uses a base rate of re-offense of 8.3 percent whereas the base rate for California offenders is four percent.  Dr. Abbott scored Foster a five on the Static-99R but adjusted that score to correct the anomaly for California offenders.  The re-offense rate for Foster's score and age group was about 10.9 percent.

Dr. Abbott opined that Dr. Murthy erred in his assessment of risk for Foster by placing him in the high risk category and then increasing his risk even more because of factors already included in that category.  In effect, Murthy double counted the risk factors.

At the conclusion of the second trial, after deliberating for less than four hours, the jury found that Foster is an SVP.

## DISCUSSION

### I.

### *The Trial Court Did Not Err in Excluding Evidence of Foster's MDO Defense.*

#### A.    The Sexually Violent Predator Act

"The SVPA provides for the involuntary civil commitment of certain sex offenders before the end of their prison or parole revocation terms.  (§ 6601.)  'In describing the underlying purpose' of the SVPA, 'the Legislature

24

expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes.' [Citation.] '[T]o the extent such persons are currently incarcerated and readily identifiable,' the Legislature has indicated that 'commitment under the SVPA is warranted immediately upon their release from prison.' [Citation.] The Act provides these individuals with 'treatment for mental disorders from which they currently suffer and reduces the threat of harm otherwise posed to the public.' [Citation.] SVPs are committed 'for an indeterminate term to the custody of [DSH] for appropriate treatment and confinement in a secure facility.' (§ 6604.)" (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 190 (*Walker*)).

"In order to commit someone under the Act, the state must establish four conditions: (1) the person has previously been convicted of at least one qualifying 'sexually violent offense' listed in section 6600, subdivision (b) (§ 6600, subd. (a)(1)); (2) the person has 'a diagnosed mental disorder that makes the person a danger to the health and safety of others' (*ibid*.); (3) the mental disorder makes it likely the person will engage in future acts of sexually violent criminal behavior if released from custody (*ibid*.); and (4) those acts will be predatory in nature (*Cooley v. Superior Court* (2003) 29 Cal.4th 228, 243 (*Cooley*)). Civil commitment can commence only if, after a trial, the trier of fact finds beyond a reasonable doubt that each of these four requirements is met. (*Ibid.*, citing §§ 6600, 6601, 6603, 6604.)" (*Walker*, *supra*, 12 Cal. 5th at p. 190.)

### B. The Trial Court Did Not Err in Preventing Foster From Presenting the MDO Defense.

Foster contends the trial court erred and deprived him of a fair trial by excluding evidence of his stated intent to recommit himself as an MDO until

clinicians decide he is entitled to be released. As he puts it, his "intended defense against the SVP commitment was that he should not be committed as an SVP because he planned to return to his already existing mentally disordered offender . . . commitment" and "voluntarily participate in treatment" and the commitment combined with the treatment he would receive "adequately protected the public."

Whether we treat this as an evidentiary issue, subject to abuse of discretion review, or review de novo as claim of legal error in precluding a defense, we conclude the argument lacks merit. It boils down to the contention that Foster was entitled to persuade a jury that he should receive "voluntary" treatment under the MDO law rather than the treatment the Legislature prescribed for SVPs.

The first flaw in Foster's argument is that it disregards the statutory language of the SVPA and the way it functions, as well as our courts' interpretations of it. The statute involves a multi-step process that includes an evaluation of the inmate by two mental health professionals pursuant to a DSH protocol to determine if he or she is a sexually violent predator (§§ 6601–6601.5), the filing of a petition in the superior court to make a finding whether there is probable cause to believe the inmate is an SVP (§§ 6601–6602), and conducting a jury trial to determine beyond a reasonable doubt that the inmate is an SVP. (§ 6603.) These provisions, in several places, state that the issue to be determined in deciding whether the inmate presents a "danger" or "menace" "to the health and safety of others" (§ 6600, subds. (a)(1), (c)) "in that it is likely that he or she will engage in sexually violent criminal behavior" (*id.*, subd. (a)(1)) if "*discharged*" or "*upon release*" into the community or not subject to "treatment and *custody*." (See § 6601, subd. (a)(2) ["If both evaluators concur that the person has a diagnosed

26

mental disorder so that the person is likely to engage in acts of sexual violence *without appropriate treatment and custody, . . .*"]; *id.*, subd. (j) ["finding of probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior *upon release*"]; § 6601.5 [if court finds petition contains facts that, if proven, would establish "probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior *upon his or her release,*" court shall order person detained and set probable cause hearing]; § 6602, subd. (a) [same; and "that the person is likely to engage in acts of sexual violence upon his or her *release from the jurisdiction of the Department of Corrections and Rehabilitation or other secure facility*"]; §6605, subd. (a)(2), (3) [where there is probable cause committed person "is not likely to engage in sexually violent criminal behavior *if discharged*," court shall set hearing; People have burden to prove committed person is "likely to engage in sexually violent criminal behavior *if discharged*"]; § 6607, subd. (a) [if Director finds "person's diagnosed mental disorder has so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment *in the community*," Director shall forward recommendation for conditional release], all italics added.) The jury must determine whether an inmate is likely to engage in sexually violent behavior *if released from custody into the community*, not whether he is likely to engage in such behavior if he *remains* in custody, willingly or otherwise. The jury in an SVPA case must decide whether the defendant will likely commit additional sexually violent offenses if he is *not in state custody*, not whether he will do so if committed to a state hospital under a different statutory regime.

27

Further, the SVPA contains its own provision for seeking an alternative to confinement in a state hospital, pursuant to which an SVP who has been committed to a state hospital for a year or more may petition for conditional release. (§ 6608, subds. (a), (f).) "If the court . . . determines that the committed person would not be a danger to others due to his or her diagnosed mental disorder while under supervision and treatment in the community, the court shall order the committed person placed with an appropriate forensic conditional release program operated by the state [that includes a "substantial portion" of "outpatient supervision and treatment"] for one year. (*Id*., subds. (f), (g).) After at least a year in such program, the person may then petition for unconditional discharge. (*Id*., subd. (m).) This is part of the multi-step SVPA process and reflects the mechanism the Legislature intended SVPs who believe they are ready for release to follow. Foster's argument that he should have been permitted to defend based on his current willingness to be confined as an MDO disregards the Legislature's provision for an SVP to enter a less restrictive program under the circumstances the SVPA sets forth. Nothing in the statute suggests a person who otherwise meets the criteria of that statute may defend on the ground that there is another and different form of in custody treatment he or she will agree to participate in instead.

As for the courts' interpretations of the SVPA, none support Foster's position. In one of the seminal cases, *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, our high court interpreted section 6601 and "the SVPA in general" to "ask[] the broader question whether, as the result of a diagnosed mental disorder, the person presents a *substantial danger* of reoffense if *released without conditions,* or whether instead he is safe only if restrained, supervised, and treated involuntarily under the Director's

28

custody." (*Ghilotti,* at pp. 926-927.) Earlier in the opinion, the court stated that the dangerousness element of the SVPA is met, the court said, "if, because of the person's diagnosed mental disorder, he or she currently presents a *substantial* danger—that is, a *serious and well-founded risk*—of criminal sexual violence unless maintained in an appropriate custodial setting which offers mandatory treatment for the disorder." (*Ghilotti,* at p. 895.) Based on that interpretation, the court held that the SVPA allows "consideration whether the disorder, though dangerous if untreated, is of a kind and extent that can be effectively treated in the community, and whether the disorder leaves the person willing and able to pursue such treatment voluntarily." (*Ghilotti,* at p. 927.) If Foster were claiming he could be effectively treated "*in the community*" and would voluntarily seek such treatment, *Ghilotti* would allow him to present such a defense. And, indeed, he was permitted to present such a defense. What *Ghilotti* does not authorize, because the court had no occasion to decide it, is whether an inmate can counter proof that he is likely to reoffend in the community, even with treatment, by proving he or she can be effectively treated in a *custodial* setting *other* than the program prescribed by the SVPA. The dichotomy the *Ghilotti* court drew between voluntary treatment *in the community* and mandatory treatment *in custody* pursuant to the SVPA does not support Foster's argument.

Although *Ghilotti* did not decide whether amenability to custodial treatment under a different statutory scheme may be raised as a defense in an SVPA proceeding,, our colleagues in the Second District did decide that issue. There, the appellant raised an argument similar to Foster's that an inmate is entitled to avoid designation as an SVP through proof that some other non-SVPA in-custody commitment and treatment would prevent him or

her from posing a danger to others. (*People v. Calderon* (2004) 124 Cal.App.4th 80, 87-90 (*Calderon*).)  The court rejected the argument.

In *Calderon*, the trial court excluded testimony by appellant's experts that " 'the best disposition of [his] case was to put him under a conservatorship under the Welfare and Institutions Code and that he could be treated in a secure nursing facility' " and that another structured placement, and not an SVPA program, would be appropriate for him. (*Calderon, supra,* 124 Cal.App.4th at pp. 86, 87.)  The Second District affirmed the judgment, rejecting Calderon's argument that the exclusion of the evidence was error.

The court distinguished *Ghilotti* on the ground that it involved voluntary treatment and custodial treatment under a conservatorship is not "voluntary" within the meaning of *Ghilotti*.  (*Calderon, supra,* 124 Cal.App.4th at p. 88.)  "Although *Ghilotti* and subsequent cases have never formally defined *voluntary* treatment, the *Ghilotti* court apparently intended such treatment should have certain attributes that could reflect an SVP candidate's reduced risk of recidivism.  For this purpose, voluntary treatment should not be conducted in a 'custodial setting which offers mandatory treatment for the disorder.'  ([*Ghilotti*], *supra*, 27 Cal.4th at p. 895.)  As opposed to involuntary treatment, voluntary treatment features an environment where the patient is 'free in the community without any conditions, supervision, monitoring, or mandatory treatment in . . . custody.' " (*Id.* at pp. 89-90, quoting *Ghilotti*, at p. 927.)

The conservatorship Calderon's experts recommended, the court held, "does not constitute voluntary treatment." (*Calderon, supra*, 124 Cal.App.4th at p. 90.)  A conservatorship under the Lanterman-Petris-Short Act (LPS Act), the court observed, "by its nature involves involuntary confinement and

30

supervision." The recommendation to commit Calderon to a " 'locked structured setting,' " "squarely contradict[ed] *Ghilotti's* interpretation of voluntariness. In other words, the doctors' plan of treatment under conservatorship was merely an alternative form of *involuntary* treatment apart from the involuntary treatment under the SVPA." (*Calderon,* at p. 90)

The same is true of MDO treatment.[6] Like the conservatorship addressed in *Calderon*, commitment as an MDO "by its nature involves involuntary confinement and supervision" (see Pen. Code, §§ 2962, 2964),[7] and is "merely an alternative form of *involuntary* treatment apart from the involuntary treatment under the SVPA." We find *Calderon's* reasoning persuasive.

The second flaw in Foster's theory is that it disregards the significant distinctions between the SVPA and the MDO statute. The MDO statute, "enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger

---

[6] Foster devotes a considerable portion of his brief discussing this court's decision in *People v. Krah* (2003) 114 Cal.App.4th 534 holding that the terms and conditions of an inmate's parole were properly excluded from evidence at his SVP trial because such temporary restrictions were "simply not relevant to the determination whether the defendant has the type of medical condition that is an element of the definition of a sexually violent predator." (*Id.* at p. 544.) Foster contends both that *Krah* is distinguishable because it involved "involuntary" treatment whereas he intends to remain committed as an MDO voluntarily and that it was wrongly decided. We find his arguments unpersuasive. We agree with *Krah* and do not find it distinguishable. But *Calderon* is more closely on point and we agree with the Second District that committing a person to a locked facility, including a state hospital that administers MDO treatment, is not voluntary treatment.

[7] Under the MDO statute, treatment must be inpatient "unless [DSH] certifies to the Board of Parole Hearings that there is reasonable cause to believe the parolee can be safely and effectively treated on an outpatient basis" in a treatment program specified by DSH. (§ 2964, subd. (a).)

to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission." (*In re Qawi* (2004) 32 Cal.4th 1, 9.) The MDO statute is "very broad and includes in its coverage a wide range of violent offenders." (*People v. McKee* (2010) 47 Cal.4th 1172, 1220 (*McKee I*) (dis. & conc. opn. of Chin, J.); see *id.* at p. 1201 (majority, listing offenses); Pen. Code, § 2962, subd. (e)(2)(A)–(Q).) The SVPA, by contrast, focuses on a " 'select group of criminal offenders who are *extremely dangerous* as the result of mental impairment, and who are likely to continue committing *acts of sexual violence* even after they have been punished for such crimes.' " (*Walker*, *supra*, 12 Cal.5th at p. 190, italics added; see § 6600, subd. (a).)

MDOs are required to undergo treatment on an inpatient basis or, in some circumstances, on an outpatient basis, either as a condition of parole (Pen. Code, §§ 2962, 2964) or, if they refuse to agree to such condition, on release from prison. (*Id.*, § 2970, subds. (a) & (b).) If a parolee-MDO's mental impairment goes into and stays in remission while he or she is on parole, the MDO statute directs DSH to discontinue treatment. Otherwise, the commitment period is one year (Pen. Code, §§ 2970, subd. (b), 2972, subd. (c)) and may be renewed thereafter for one-year periods. (*People v. Kirkland* (1994) 24 Cal.App.4th 891, 902-903.) The SVPA, by contrast, subjects SVPs to indeterminate commitment (Pen Code, §§ 6604, 6604.1), subject to annual examination of their mental conditions and petitions for discharge by the SVP or by DSH. (§§ 6604.9, subds. (a), (d), 6605, subd. (c).) The SVP may petition for conditional release, and only after a year of state-supervised release may he or she seek unconditional release.

After remand from the Supreme Court in *McKee I* and a trial, the Court of Appeal found substantial evidence supported the differences in the

statutory treatment of MDOs and SVPs. The evidence showed that "the inherent nature of the SVP's mental disorder makes recidivism significantly more likely for SVP's as a class than for MDO's[,]" "that SVP's have significantly different diagnoses from those of MDO's . . . , and that their respective treatment plans, compliance, and success rates are likewise significantly different." (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1340-1342, 1347 (*McKee II*).) The evidence showed "SVP's are less likely to participate in treatment, less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative" than MDOs and supported "a reasonable inference that an indeterminate, rather than a determinate . . ., term of civil commitment supports, rather than detracts from, the treatment plans for SVP's." (*Ibid.*) In short, the evidence demonstrated " 'that, as a class, SVP's are clinically distinct from MDO's . . . and that those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than are MDO's . . . .' " (*Ibid.*)[8]

The Legislature adopted the SVPA notwithstanding the existence of the MDO statute, of which it was well aware,[9] presumably because it viewed MDO treatment as inadequate to address the risks posed by sexually violent predators. If it had considered MDO treatment adequate, it would have had no reason to adopt the SVPA. The same is true of the voters, who in 2005 adopted Jessica's Law strengthening the SVPA by, among other things, making commitments under the law indeterminate. (See *McKee I, supra,* 47 Cal.4th at p. 1187 [describing Proposition 83, also known as "Jessica's Law"].) The 2006 ballot pamphlet for Proposition 83 emphasized the

_____

[8] We agreed with *McKee II*'s holding that these differences justified treating SVPs differently from MDOs in *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1085-1086.

[9] See § 6250, subd. (b); Stats. 1995, ch. 762, § 2.

" ' "dramatically higher recidivism rate" ' " for sex offenders than " ' "for any other type of violent felon," ' " saying, "sexual offenders are the least likely to be cured and the most likely to reoffend." (*McKee I,* at p. 1206; see Voters Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, p. 127)

The MDO-commitment defense Foster advocates, if accepted, would undermine the SVPA. It would entrust to juries the task of deciding whether an inmate the state seeks to commit as an SVP should instead be found to be an MDO and therefore treated under the MDO protocols rather than the more restrictive treatment prescribed for SVPs. (Cf. *Calderon, supra,* 124 Cal.App.4th at p. 90 [replacing SVPA with conservatorship under LPS Act would "significantly compromise[]" protection of community afforded by SVPA.] The statutory schemes for the two types of commitment and treatment do not appear to contemplate such either/or trials, which would complicate juries' already challenging task of deciding whether inmates meet the criteria set forth in the SVPA statute. The SVPA statute simply does not require a jury to determine whether an inmate who has a mental disorder that predisposes him to commit sexual violence would be amenable to, or could be kept safe through confinement and treatment under another, less restrictive statute.[10]

In short, the MDO defense Foster sought to present was legally untenable, and the evidence he sought to submit to prove it was not relevant to the issues the jury was required by the SVPA to decide. Neither the

---

[10] In *McKee II*, the court held that the equal protection clause does not require the SVPA to treat sexually violent predators using the "least restrictive means available." (*McKee II, supra,* 207 Cal.App.4th at pp. 1348-1349; see also *People v. Superior Court* (*Quarles*) (2020) 45 Cal.App.5th 637, 651-653 [trial court erred by considering least restrictive placement as part of SVP determination].)

defense nor the evidence was erroneously excluded; nor did the exclusion violate Foster's right to a fair trial.

## II.

### *Exclusion of the Testimony of Foster's Recent Therapist Was Neither Erroneous Nor Prejudicial.*

Foster's second claim of error concerns the trial court's refusal to allow him to call as a percipient witness Dr. Jeannie Brown, a therapist who treated him with EMDR at Coalinga State Hospital. The trial court had limited both the People and the defense to two expert witnesses each. When defense counsel sought to present the testimony of Brown as a therapist who had recently treated Foster, the court expressed concern that he was trying to call a third expert witness. Defense counsel argued he was not offering her as an expert on SVP but as a percipient witness of appellant's participation in treatment. The prosecuting attorney responded that the only way Brown's testimony would be relevant was if she explained how the treatment worked and said whether it had benefited Foster, either of which would require her to demonstrate her expertise.

Later, when defense counsel was cross-examining Dr. Murthy about his conversations with state hospital personnel involved in Foster's treatment, he elicited testimony that Dr. Brown provided individual therapy sessions to Foster at Coalinga State Hospital primarily using EMDR treatment. The court permitted defense counsel to pose some hypothetical questions to Murthy about treatment provided by Brown but ultimately stopped him because the court was concerned that he would never lay the foundation for them. Thereafter, the court denied the defense request that Brown be permitted to testify in addition to the two experts he had previously disclosed. The court disagreed that Brown could give meaningful testimony as a percipient witness because the testimony defense counsel sought to

35

present concerned the significance of the treatment she provided to Foster, which would require her to testify as an expert. The court reiterated that it had allowed each side to present two experts, that defense counsel could call Brown instead of one of the experts he had listed on his witness list and that defense counsel had declined to do so.

Foster concedes that a trial court has discretion to limit the number of expert witnesses and that we review such decisions for abuse of discretion. He argues the trial court abused its discretion in excluding Dr. Brown's testimony because her testimony would not have been cumulative of the testimony of his other experts. Specifically, he argues "the trial court abused its discretion by offering appellant a choice of giving up his opportunity to present repetitive evidence in a coequal way with the district attorney or giving up his opportunity to present other important and relevant evidence from another witness." Further, he argues the trial court treated him unfairly because it allowed the People to call a third expert, Dr. Gould, a psychiatrist who testified about what Foster told him during Gould's interview of him in 2004.

The People argue that there was no abuse of discretion because the court "reasonably concluded that Dr. Brown would have had to qualify as an expert in order to opine on the successes of the EMDR therapies appellant received. The parties had agreed to limit the number of experts to two per side. Accordingly, the trial court did not err by imposing limits on the number of experts the defense could present." The People also contend that, even assuming evidentiary error, Foster has not shown a reasonable probability of a better result in the absence of the error. (Citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

36

The People have the better argument. Trial courts have authority and, indeed, the duty to manage trials efficiently. (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 20; Standards of Judicial Administration (Thompson Reuters 2022) standard 2.1, subds. (a) & (b).) Among other things, they have discretion to limit the number of expert witnesses, to be called by any party. (Evid. Code, § 723.) Further, it appears in this case that the parties agreed they would each present two expert witnesses, not three.

Foster's contention that he has a right "to present repetitive evidence in a coequal way with the district attorney" without giving up his right to present another witness ignores the fact that he and the prosecutor apparently stipulated to limit the number of expert witnesses they would call to two each, and the trial court so ordered. Presumably because the parties agreed to it, Foster does not challenge that limit. Instead, he argues only that Dr. Brown should have been allowed to testify because *her* testimony would not be cumulative of the other experts' testimony. But as he concedes on appeal, the two experts he chose to call were to some extent cumulative ("repetitive"), and the trial court offered him the option of having Brown testify instead of one of those others, which he declined.

Nor is his assertion that the court treated him unfairly by allowing the People to call Dr. Gould persuasive. The trial court did not act unfairly in allowing Gould to testify as a percipient witness while excluding Dr. Brown as a third expert. Gould testified about the interview he had with Foster in 2004 and was not asked to provide opinions about Foster's treatment, current mental state or propensity to commit sexual offenses. Nor was Gould

designated as an expert at trial.[11] But his direct testimony consisted entirely of describing what Foster told him during the interview, which the court could reasonably conclude was percipient witness testimony.

Dr. Brown, by contrast, was expected to testify about her treatment of Foster for his past trauma and the procedure she used, which is called "EMDR." As the trial court explained prior to denying the request, "there's no way for Jeannie Brown to testify about what she does without laying qualification for an expert. And the treatment that she gave to the defendant would be meaningless, it would be irrelevant unless she explained to the jury the significance of the treatment and in order to do that she has to pose as an expert to do just that." We agree. The only relevance of the proposed testimony was to the required element that Foster's mental disorder made it likely he will engage in future acts of sexually violent criminal behavior if released from custody. That is, did the treatment he had received alleviate the mental disorder and/or reduce the likelihood that he would commit a future offense if released from custody? To answer those questions would have required Brown to testify as an expert.

Dr. Abrams discussed the medication Foster was taking and explained that it reduces people's sex drive, anger and liability to violence and stops hallucinations and delusions. He also testified that EMDR has the effect of enabling a person to develop emotional distance from past traumatic events and has been an effective therapeutic tool. In response to a hypothetical

---

[11] He testified that he was a psychiatrist, which provided the context for his 2004 interview of Foster, but he did not go through a recitation of his qualifications. He also testified that he had prepared thousands of similar reports over the decades, but this was significant because it explained why he could not remember his interview with Foster without reading or referring to his report, which the prosecutor asked the court to allow him to do.

about an MDO who received EMDR and was later released, he opined that such a person would be better equipped to function successfully in the community. Dr. Abbott testified that Foster had never suffered from sexual sadism disorder and did not have antisocial personality disorder, and while he did have schizoaffective disorder it was in remission. He also opined that Dr. Murthy misapplied the risk assessment tool he used and double counted certain risk factors and that Abbott's administration of the test resulted in a lower risk score for re-offense.

Both Dr. Abrams and Dr. Abbott thus addressed the dangerousness component of an SVP designation, albeit in different ways. Abrams testified about the effects of drugs and treatment on Foster's risk of recidivism, and Abbott discussed the underlying diagnoses and the application of a particular test for recidivism. Dr. Brown's testimony, which would have been relevant to the same issue, was in that broad sense cumulative because its relevance concerned the same basic issue the other defense experts had addressed in their testimony. (See *Belfiore-Braman v. Rotenberg* (2018) 25 Cal.App.5th 234, 249 [potential expert's opinion addressing whether surgery caused plaintiff's injury, though expressing different factual theory than testifying expert, was cumulative because it "would not have addressed an ' "area that hasn't been gone into" ' "].)

We conclude the trial court did not abuse its discretion by treating Dr. Brown's proposed testimony about her treatment of Foster as expert testimony and denying the defense request to call her unless he withdrew one of his other experts. Admission of the testimony would have violated the agreed-upon limit of two experts per side and would have been cumulative. Brown's testimony in its particulars was different from the testimony of the

other defense experts but it addressed the same dangerousness element that Dr. Abrams's and Dr. Abbott's testimony would address.

We also agree with the People that even if the trial court had erred, any such error was not prejudicial for two reasons. First, Foster himself testified about the treatment, explaining it was a "technique that uses eye movement to release or lower stress from prior, um, trauma." He had seven or eight sessions with Dr. Brown, each one focusing on a particular past trauma in his life, such as his mother abandoning him when he was a child and a foster father who was mean to him and sexually molested him. After each session, his memories about the trauma "were not as haunting" and he felt "like there was that healing thing inside of my head." He stopped rocking during therapy, which was something he does "all the time." Dr. Murthy testified that he spoke with Brown about Foster because she was treating him at the time. Further, defense expert Dr. Abbott also briefly testified about EMDR and its general effects. Thus, the jury was made aware of the treatment and its effects on Foster notwithstanding that Brown's testimony was excluded.

Second, we find it highly unlikely that the jury would find seven or eight sessions of therapy to address past trauma was reason to find Foster was unlikely to commit sexual offenses again, when he had previously committed three rapes and, after his release from a mental hospital following decades of treatment, set out to rape a fourth woman. This is so even though he did not follow through on the sexual part of the fourth assault. He had been in prison since 2004, and there was no evidence that he received treatment for his disorders while in prison. The brief treatment he received from Dr. Brown while detained in the mental hospital awaiting his SVPA trial focused on PTSD rather than on the mental disorders with which he had been diagnosed and for which he had been treated for 20-plus years without

40

success. Under these circumstances, Foster has not shown a reasonable probability that the outcome of the trial would have been different if Brown had testified.

**III.**

***The Trial Court's Rulings on Some Objections During the Defense Cross-Examination of Dr. Owen Were Erroneous But Not Prejudicial.***

Foster's third claim of error is that the trial court abused its discretion by "preventing" his counsel from cross-examining Dr. Owen to establish bias. The trial court sustained some, but not all, the objections the prosecutor raised during defense counsel's cross-examination on that subject. The most relevant portion of the transcript is relatively brief, and we quote it in full.

"Q. The—now, you had two reports, the first report was August 30, 2018, and the second report was June 20th, 2019, correct?

"A. Yes.

"THE COURT: Counsel, that's vague. You said you had two reports, you mean he wrote two reports or he had access to two reports he reviewed.

"[Defense counsel]: Thank you, your Honor.

"BY [Defense Counsel]

"Q. Your two reports, the reports that you authored in this case, the first one was dated as the report date was August 30th, 2018, correct?

"A. Yes.

"Q. And your second report was dated June 20th, 2019?

"A. True.

"Q. Now, is it—isn't it correct that the Department of State Hospitals has by statute and regulation that [*sic*] updated reports are only required after a year has passed; is that correct?

"[Prosecutor]: Objection.

41

"THE COURT: That's sustained. It's not relevant. Next question, please.

"BY [Defense Counsel]

"Q. Is there any reason why you prepared a report before even a year had passed on your first report?

"[Prosecutor]: Same objection.

"THE COURT: You can answer. Is there—I want to hear the question [*sic*]. Is there some reason why?

"THE WITNESS: Simply that I asked [*sic*] to do this by the Department of State Hospitals. I don't know their reason.

"[Defense Counsel]: Okay.

"BY [Defense Counsel]

"Q. Okay. And second report—in your first report you referenced—I'm not asking the content, but you referenced an examination of a report of a Dr. Chamberlain, correct?

"A. Yes.

"Q. And that report was dated 12/10/04, correct?

"A. Yes.

"Q. And at that time when you made your initial report, was the report of Dr. Gould also available?

"A. I did not have that report at the time.

"Q. And in your report of June 20th, 2019, you did reference a report from Dr. Gould dated—that report was dated December 9th, 2004 correct?

"A. Yes.

"Q. Um, do you know the initial documents you reviewed that you listed in your initial report, do you know who—you got those from the Department of State Hospitals, correct?

42

"A.   I did.

"Q.   Isn't it correct that the District Attorney provides those documents to the Department of State Hospitals?

"A.   I think some of them they obtain from state prison system and some come in a packet from the District Attorney.

"Q.   Okay.  Do you know whether or not the report in your initial report, the report from Dr. Chamberlain came from the District Attorney or the Department of State Hospitals?

"[Prosecutor]:  Objection as to relevance.

"THE COURT:  That's sustained.  Next question, please.

"BY [Defense Counsel]

"Q.  Do you know whether or not—or where the—when you prepared your second report, do you know who—you got that from the Department of State Hospitals, correct?

"A.   I got what?

"Q.   The Gould report.

"A.   Yes.

"Q.   And do you know who—how the Department of State Hospitals obtained it or do you know whether or not [the prosecutor] provided it to the Department of State Hospitals?

"[Prosecutor]:  What is the relevance?

"THE COURT:  It's sustained.  Lack of relevance.

"BY [Defense Counsel]

"Q.   Did you at any time, between the completion of your first report in 2018, and your completion of your report on June 20th, 2019, have any conversations about either Mr. Foster or your reports with [the Prosecutor]?

"THE COURT:  What's the relevance of this?  That would be hearsay.

43

"[Defense Counsel]: It's asking for the content [*sic*], I'm asking if you had any conversations.

"THE COURT: There's an objection on relevance. It's sustained. Next question, please.

"BY [Defense Counsel]

"Q. I think it's a different question, your Honor, that I want to ask.

"Did [the Prosecutor] indicate to you anything about the Dr. Gould report between the preparation of your first report August 2018, and your report of June 20th, 2019?

"[Prosecutor]: Objection, and I'd ask to approach at this point.

"THE COURT: No. I'm going to allow the question. You can answer. Did [the Prosecutor] tell you anything about the Dr. Gould's report?

"THE WITNESS: He did.

"BY [Defense Counsel]

"Q. Okay. And what did he tell you?

"THE COURT: That's vague, it's 352. If you have a good-faith belief it's something, counsel, you're welcome to ask a leading question.

"[The Prosecutor]: Well, I would like hearsay [*sic*].

"BY [Defense Counsel]

"Q. Did he indicate to you in that timeframe what that conversation or conversations [*sic*] that he wanted you to focus in your new report on the Dr. Gould report?

"[The Prosecutor]: Hearsay.

"THE COURT: The objection's sustained.

"BY [Defense Counsel]

"Q. Did [the Prosecutor] contact you and did—or did you discuss with [the Prosecutor] testifying about testifying in this case in May, 2019?

"[Prosecutor]: Your Honor, objection, relevance.

"THE COURT: That's sustained. Do not answer. Next question, please.

"BY [Defense Counsel]

"Q. Were you asked to testify?

[The Prosecutor]: Your Honor, same objection, relevance.

"THE COURT: It's sustained. [Defense counsel], please move on. It's not relevant.

"[Defense Counsel]: No further questions at this time, your Honor."

Contrary to Foster's characterization, the trial court did not "deprive [defense counsel] of the opportunity to show potential bias." Earlier in the cross-examination, defense counsel had elicited that during the 23 years Dr. Owen had been performing SVP evaluations, he had done so under contract with the State; that during a one- or two-year period when SVP work provided his primary source of income, Owen had earned more than $800,000 from that contracting position; and that one earlier year he made "a million and a half dollars" from the state for that work.

Defense counsel elicited from Dr. Owen that when he prepared his initial report, he did not have the Gould report even though it existed and was created at the same time as another report (Chamberlain) he did have. Owen relied on the Gould report in Owen's second (updated) report and in his testimony. Defense counsel established that the prosecutor spoke with Owen about the Gould report between the time Owen drafted his first and second reports, and earlier he had elicited from Owen that he had spoken with the prosecutor in preparation for his testimony and that the prosecutor had provided him with some documents (although Owen had the documents already). Defense counsel was able to suggest that Owen prepared his first

45

report without all relevant information, that the prosecutor encouraged Owen to rely on the Gould report in Owen's second report and that Owen obliged him by doing so.

Two of the trial court's evidentiary rulings in the above-quoted portion of the cross-examination were erroneous. First, the court incorrectly sustained the prosecutor's hearsay objection to the question whether he had asked Dr. Owen to focus in his second report on the information contained in the Gould report. A directive or request generally is not an assertion of fact and has no inherent truth (*People v. Curl* (2009) 46 Cal.4th 339, 362; *People v. Jurado* (2006) 38 Cal.4th 72, 117), and here any request by the prosecutor of Owen to focus on Dr. Gould's report was not offered for its truth. As Foster points out, defense counsel was seeking to elicit the prosecutor's directive or request to show the prosecutor was telling Owen what to say and to establish Owen's *bias*. The bias the defense counsel sought to establish was based on the theory that the prosecutor was calling the shots and not on whether the shots he was calling were meritorious or in any sense truthful. "When the very thing in issue is whether certain words were said and not whether those words are true or false, the words are not hearsay." (M. Simons, Cal. Evidence Manual (Thompson Reuters 2022) § 2:14, p. 92, citing *Stebbins v. White* (1987) 190 Cal.App.3d 769, 787 [offer of bribe was not hearsay]; *Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 749 [employer's assurances of job security were not hearsay].) Second, the trial court erred in precluding Owen from answering questions about whether the prosecutor had asked him to testify or spoken with him about his testimony on the ground the answers were irrelevant. The answers *were* relevant to whether Owen harbored a pro-prosecution bias.

However, as we have indicated, the court did allow defense counsel to ask some questions relating to potential bias that proved successful. The court also permitted him to ask other questions relating to bias that turned out to be less fruitful. For example, Dr. Owen testified he received the initial documents and (subsequently) the Gould report from *DSH* (i.e., not the prosecutor). Further, defense counsel was permitted to ask why Owen had prepared a report before even a year had passed since he prepared the first report. Owen testified he was asked by DSH (i.e., not the prosecutor) to do so. Though the answers to these questions did not support the defense theory that Owen had a bias in favor of the prosecutor, that does not mean he was denied the *opportunity* to attempt to prove such bias. A party is entitled to explore bias on cross-examination, but that does not mean the exploration will be successful.

We are not persuaded by Foster's argument that he should not be required to show prejudice because his inability to obtain answers to the questions to which the court erroneously sustained objections left him unable to do so. Even in cases in which limitations on cross-examination were claimed to violate the defendant's right to confrontation under the Sixth Amendment, our high court has repeatedly applied harmless error analysis. (See, e.g., *People v. Sully* (1991) 53 Cal.3d 1195, 1219-1220; *People v. Gonzalez* (2021) 12 Cal.5th 367, 406-407.) Foster does not contend his constitutional right to confrontation was violated but argues only that the trial court abused its discretion in sustaining objections based on relevance and hearsay. We review errors under the Evidence Code for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 and "ask whether it was reasonably probable the error affected the outcome of the case." (*People v. Robinson* (2020) 47 Cal.App.5th 1027, 1032-1033; *People v. Garcia* (2008)

47

160 Cal.App.4th 124, 133 [where trial court's erroneous ruling is not refusal to allow defendant to present defense but only rejects certain evidence concerning the defense, error is analyzed for prejudice under *Watson*].)

Applying that standard, we conclude that the erroneous rulings that the prosecutor's communications with Dr. Owen were hearsay and irrelevant were plainly harmless. Even if Owen had answered the questions to which the trial court erroneously sustained the hearsay and relevance objections and Owen had testified that the prosecutor asked him to testify and directed him to focus on the Gould report in his testimony or written report, it is not reasonably probable that Foster would have obtained a more favorable result.

The relevant contents of the Gould report were presented to the jury, through the testimony of Dr. Gould who was permitted to read from his report. Foster's statements to Gould, as relayed by Gould to the jury, provided exceedingly strong evidence that Foster is, or at least was, a sexually violent predator. Among other things, Foster admitted committing three separate rapes. When he was discharged from prison in 2004 after having committed three separate rapes, he very quickly reoffended (within 60-70 days). While that offense was not prosecuted as a sexual offense, Foster admitted he had intended to rape a woman he saw on the street, and when she went into a business establishment and got away, sought out another woman for the purposes of committing rape. He did not ultimately rape that woman but was violent and close to doing so (he pushed her down and had straddled her in her hotel room) before stopping himself and taking her purse instead.

Dr. Murthy also interviewed Foster in 2017. Both Murthy and Dr. Owen diagnosed Foster with a combination of serious mental disorders, such as schizoaffective disorder, antisocial personality disorder and paraphilia

48

(including sexual sadism). Each opined that these disorders predisposed him to commit sexually violent offenses and some of them, alone or in combination, tend to persist throughout a lifetime.

Further, there was little evidence of significant change in Foster's mental impairments or his ability to control his conduct between 2004 and the present. Most of that time he had been in prison without therapeutic treatment, and he received only a few months of treatment after being moved from prison to the Coalinga State Hospital. Fosters' experts did not deny that he had mental impairments but opined they were in remission or didn't present a serious risk of re-offense. Foster testified about physical impairments he claimed would prevent him from re-offending, but the evidence was in tension with his testimony that he was washing windows at the hospital and expected to be able to get a temporary job cooking. His plans for release were limited in scope. He lacked a clear plan for obtaining housing and the continued treatment he acknowledged he needed.

Finally, on the strength of this record, the jury returned a verdict after deliberating for less than four hours. Even if defense counsel had been able to show that the prosecutor communicated with Dr. Owen to such a degree as to indicate his testimony was influenced by the prosecution, that would not have undermined the credibility of Dr. Gould, who testified about Foster's damning admissions, or of Dr. Murthy, who reached the same ultimate conclusions as Owen. In short, the erroneously sustained objections to a few questions on defense counsel's cross-examination of Owen would not likely have made a difference in the outcome of his trial and were not prejudicial under *Watson*.

## DISPOSITION

The judgment is affirmed.

_____

STEWART, Acting P.J.

We concur.

_____

MILLER, J.

_____

MAYFIELD, J. *

*People v. Foster* (A158258)

_____

    * Judge of the Mendocino Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.